**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **MOTHER DOE, as parent and** | : | |
| **Natural guardian for JANE DOE, a minor** | : | |
| **and JANE SMITH,** | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | **C. A. No.:  1:20-cv-10310-IT** |
| | : | |
| | : | |
| **-against-** | : | |
| | : | |
| | : | |
| **TOWN OF NORTH ANDOVER,** | : | <u>**AMENDED COMPLAINT**</u> |
| **NORTH ANDOVER SCHOOL DISTRICT,** | : | |
| **NORTH ANDOVER SCHOOL COMMITTEE,** | : | |
| **CHET JACKSON, in his official and individual** | : | |
| **capacity, GREGG T. GILLIGAN, in his official** | : | |
| **and individual capacity, SCOTT YOUNG, in** | : | |
| **his official and individual capacity, BROOKE** | : | |
| **RANDALL, in her official and individual** | : | |
| **capacity,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

Plaintiffs Mother Doe, as parent and natural guardian for minor Jane Doe ("Plaintiff Doe"), and Jane Smith ("Plaintiff Smith"), collectively with Plaintiff Doe the "Plaintiffs"[1], by their attorneys Nesenoff & Miltenberg, LLP, as and for their Complaint, respectfully allege as follows:

<u>**THE NATURE OF THIS ACTION**</u>

1.      The North Andover High School (hereinafter "NAHS") purports to be "a community" where its students "will spend four very impactful years" and eventually grow to be "engaged learners, insightful thinkers, and effective communicators." True to its word, NAHS offered Plaintiffs an unmatched life experience, the impact of which will, in all likelihood, haunt

---

[1] Plaintiffs filed a joint Motion to Proceed Pseudonymously on February 14, 2020, which this Court granted on February 24, 2020.

1

Plaintiffs for the remainder of their lives. Indeed, after what was sure to be the most frightening and harrowing experiences of Plaintiffs' respective lives, Plaintiffs turned to NAHS and its various agents and employees for security and protection. Instead, they were greeted with outright disregard, disinterest, skepticism, and further made to feel victimized by the very institution that promised to "maintain a safe and secure environment" for them.

2.      Briefly, Plaintiffs share several similarities, not the least of which is their status as former NAHS students who were horrifically and tragically sexually assaulted by the same assailant, former NAHS student Eliezer Tuttle ("Tuttle"). In addition, both Plaintiffs unfortunately received the same stonewalling and defiant response from NAHS after reporting their rapes to the proper authorities. Indeed, following disclosure of their assaults to NAHS, Plaintiffs were made to feel responsible for Tuttle's criminal behavior, penalized by their school and high ranking administrators for being brave enough to come forward as victims, and ultimately forced to change their entire lives just to survive through high school, all the while knowing and observing Defendants cater to and favor their assailant.

3.      Accordingly, this is a civil action on behalf of Plaintiff Doe and Plaintiff Smith for, among other things, violations of Plaintiffs' rights as guaranteed by (i) Title IX of the Education Amendments of 1994 ("Title IX"), (ii) the Equal Protection Clause of the 14th Amendment of the United States Constitution as guaranteed by 42 U.S.C. § 1983, and (iii) Massachusetts State Law, together with any and all claims which can be reasonably inferred from the facts as set forth herein.

## THE PARTIES[2,3]

4.      Plaintiff Mother Doe is the parent and natural legal guardian of Plaintiff Doe, a minor.

5.      Both Mother Doe and Plaintiff Doe are residents and domiciliaries of the Commonwealth of Massachusetts.

6.      At all times relevant to this Complaint, and continuing through the present, Plaintiff Doe has been an individual under the age of majority.

7.      At all times relevant to this Complaint, Plaintiff Smith was a resident and domiciliary of the Commonwealth of Massachusetts.

8.      At all times relevant to this Complaint, Plaintiff Smith was an individual under the age of majority. Plaintiff Smith reached the age of majority in September of 2018.

9.      Upon information and belief, at all times relevant to this Complaint, the Town of North Andover (the "Town") was and is a political subdivision organized and incorporated under the laws of the Commonwealth of Massachusetts with a principal office at 120 Main Street, North Andover, Massachusetts 01845.

10.      Upon information and belief, at all times relevant to this Complaint, NAHS was and is a public high school located within, and under the jurisdiction of, the Town at 430 Osgood Street, North Andover, Massachusetts 01845.

11.      Upon information and belief, at all times relevant to this Complaint, the North Andover School District d/b/a North Andover Public Schools (the "District") was and is a duly constituted school district within the Commonwealth of Massachusetts and under the jurisdiction

---

[2] The Town of North Andover, North Andover School Committee, and North Andover School District are herein collectively referred to as the "District Defendants" or "Town Defendants" throughout this Amended Complaint.
[3] Defendants Chester Jackson, Brooke Randall, Scott Young, and Gregg Gilligan are herein collectively referred to as the "Individual Defendants."

of the Town which provides public education to students within the Town through various public educational institutions, including NAHS.

12.     The District's principal office is located at 566 Main Street, North Andover, Massachusetts, 01845.

13.     Upon information and belief, the District receives federal funding. Upon information and belief, the District thereafter allocates, at least in part, monies generated through federal funding to NAHS. Accordingly, the NAHS and the District are subject to liability under Title IX.

14.     Upon information and belief, at all times relevant to this Complaint, defendant Chester "Chet" Jackson ("VP Jackson") served as Vice Principal of NAHS.

15.     Upon information and belief, following the events described herein, VP Jackson was promoted to principal of NAHS and continues to serve as Principal of NAHS to date.

16.     VP Jackson, at all times relevant, acted as a decision maker with respect to the terms and conditions of Plaintiffs' educational environment, and possessed authority and responsibility to establish and implement the District's policies at NAHS.

17.     VP Jackson's last known business address is 430 Osgood Street, North Andover, Massachusetts 01845.

18.     Upon information and belief, at all times relevant to this Complaint, Defendant Gregg T. Gilligan ("Coordinator Gilligan") served as the Assistant Superintendent of the District, and also served as the Title IX Coordinator of NAHS.

19.     Upon information and belief, following the events described herein, Coordinator Gilligan was promoted to Superintendent of the District, and continues to serve as Superintendent to date.

20.     Coordinator Gilligan, at all times relevant to this Complaint, acted as a decision maker with respect to the terms and conditions of Plaintiffs' educational environment, and possessed authority and responsibility to establish and implement the District's policies at NAHS.

21.     Coordinator Gilligan's last known business address is 566 Main Street, North Andover, Massachusetts 01845.

22.     Upon information and belief, at all times relevant to this Complaint, Defendant Scott Young ("Assistant Principal Young") served as an Assistant Principal at NAHS.

23.     Assistant Principal Young, at all times relevant to this Complaint, acted as a decision maker with respect to the terms and conditions of Plaintiffs' educational environment, and possessed authority and responsibility to establish and implement the District's policies at NAHS.

24.     Assistant Principal Young's last known business address is 430 Osgood Street, North Andover, Massachusetts 01845

25.     Upon information and belief, at all times relevant to this Complaint, Defendant Brooke Randall ("Assistant Principal Randall") served as an Assistant Principal at NAHS.

26.     Assistant Principal Randall, at all times relevant to this Complaint, acted as a decision maker with respect to the terms and conditions of Plaintiffs' educational environment, and possessed authority and responsibility to establish and implement the District's policies at NAHS.

27.     Assistant Principal Randall's last known business address is 430 Osgood Street, North Andover, Massachusetts 01845.

28.     Upon information and belief, at all times relevant to this Complaint, the North Andover School Committee (the "School Committee") was the governing body of the District and

was responsible for, among other things, developing and approving relevant policies and procedures, and overseeing the administrators, agents, and employees of NAHS.

29.     As of the date of this filing, the School Committee consists of the following elected members: David Torrisi (Chair), Helen Pickard (Vice Chair), Amy Mabley (Clerk), Andrew McDevitt (Member), and Holly Vietzke-Lynch (Member).

30.     The School Committee maintains a principal office at 566 Main Street, North Andover, Massachusetts, 01845.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

32.     Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events and/or occurrences giving rise to Plaintiffs' claims occurred within this judicial district.

33.     On or about October 11, 2019, Plaintiffs served upon the appropriate executives and persons a Notice of Claim pursuant to G.L. c. 258, § 4.

## FACTUAL ALLEGATIONS

### I.     The District Defendants' Policies and Procedures Applicable to All Students

34.     Upon information and belief, at all times relevant to this Complaint, NAHS maintained and enforced a Student Handbook (the "NAHS Handbook"), and also abided by the District wide Student Rights and Responsibilities Handbook (the "District Handbook" and collectively with the NAHS Handbook the "Handbooks")[4].

---

[4] In light of the time lapse between the within events and the date of this filing, the only publicly available copies of the District Handbook is from the 2019-2020 school year and the closest publicly available copy of the NAHS Handbook is from the 2018-2019 school year. The following citations and references are based on those publicly available versions of the Handbooks

35.     Upon information and belief, the Handbooks set forth the rights of every student enrolled in the District, including students, like the Plaintiffs, who attended NAHS.

36.     The Handbooks constituted a contract between the students and the District. In consideration for Plaintiffs' enrollment and acceptance of the terms of the Handbooks, which they assented to upon enrollment, Town Defendants assured Plaintiffs that it would comply with its policies and procedures articulated in the Handbooks, including in carrying out any disciplinary process with basic fairness.

37.     The Handbook highlights that "[s]tudents have rights by virtue of guarantees offered under the federal and state constitutions and statutes…[i]n connection with rights, there are responsibilities that must be assumed by students" and specifically notes that "civil rights – including the rights to equal educational opportunity and freedom from discrimination; the responsibility not to discriminate against others" are included within these rights.

38.     Within the Handbook, the policy regarding the Right to be Free from Sexual Harassment states that "sexual harassment in the employment and education environment is unlawful" (included within the "Policies"). The Policies continue that "[i]t will be a violation of this policy for any student, employee or agent of the district to harass another student, employee or agent of the district through conduct or communications of a sexual nature."

39.     Sexual harassment is defined generally in the Policies as "unwelcomed or unwanted sexual advances, requests for sexual favors, and/or other inappropriate oral, written, or physical conduct of a sexual nature."

40.     Behaviors that constitute sexual harassment, pursuant to the Policies, include, but are not limited to, "verbal harassment or abuse, pressure for sexual activity, repeated remarks to a person with sexual or demeaning implications, unwelcomed touching, suggesting or demanding

sexual involvement accompanied by implied or explicit threats…display of sexually suggestive objects or pictures."

41.     Retaliation for reporting violations of sexual harassment, or assisting in an investigation, is explicitly prohibited by the Policies.

42.     A student that is charged with sexual harassment is subject to disciplinary actions that range from a verbal warning up to and including expulsion.

43.     The Policies also contain a "harassment policy" which affords a student "the right to be free from any type of harassment by other students while…on school grounds, School District property, or property within the jurisdiction of the School District, school buses, or attending or engaging in school activities."

44.     Harassment is defined in the Policies as "conduct of a verbal or physical nature that is designed to embarrass, distress, agitate, disturb or trouble students when:

   a.   submission to such conduct is made either explicitly or implicitly a term or condition of a student's education or of a student's participation in school programs or activities;

   b.   submission to or rejection of such conduct by a student is used as the basis for decisions affecting the student, or;

   c.   such conduct has the purpose or effect of unreasonably interfering with a student's performance."

45.     Harassment can include, but is not limited to "verbal, physical or written (including texting, blogging or other technological methods) harassment or abuse; repeated remarks of a demeaning nature…demeaning jokes, stories, or other activities directed at the student bullying and cyberbullying."

46.     The Policies require that "[a]llegations of harassment will be promptly and reasonably investigated" and that the Principal is responsible for handing complaints.

47.     Retaliation against a student that filed a complaint of harassment, or anyone who participated or aided in the investigation, is strictly prohibited by the Policies.

48.     A student that is found to violate the harassment policy is subject to disciplinary sanctions, up to and including expulsion.

49.     The procedure for filing a Title IX complaint is also contained within the Policies. It is explicitly noted that North Andover Public Schools do not "discriminate on the basis of age, sex, race, religion, color, marital status, gender identity, sexual orientation, disability or national origin in its educational programs [or] activities…as required by Title IX of the 1972 Education Amendments."

50.     The Assistant Superintendent is responsible for implementation and evaluation of all Title IX activities.

51.     The Policies afford students who feel discriminated against in violation of Title IX the right to register a grievance. Upon receipt of an allegation, the principal is required to investigate the allegations, interview the complainant, and respond in writing within ten (10) school days. Should the matter remain unresolved, a complainant can appeal in writing to the Title IX Coordinator.

52.     The Policies continue to state that the Title IX Coordinator is required to meet with the complainant within ten (10) school days of the complaint. If the matter still remains unresolved ten (10) school days after written response from the Title IX Coordinator, the student can appeal to the Superintendent.

53. The Superintendent is required to investigate and respond to the complainant within ten (10) school days. Should the matter still remain unresolved after conference with the Superintendent, the student can appeal to the School Committee within ten (10) school days of receipt of the Superintendent's response.

54. The School Committee is required to meet for review and consideration of the matter within fifteen (15) school days. A subsequent written response from the School Committee to the student is required within five (5) school days.

55. The Handbooks offer that "[f]airness in procedures will be observed both to safeguard the legitimate interests of the schools and to exhibit by appropriate example the basic objectives of a democratic society as set forth in the Constitutions of the United States and the State" and that "in disciplinary matters, teachers and administrators are fair and just."

## II.   Plaintiff Doe's Experiences at the NAHS

### a.   Background Information

56. For the majority of Plaintiff Doe's adolescent years, she has been enrolled as a student in the District and, in the Fall of 2016, began attending NAHS as a freshman student.

57. Plaintiff Doe was excited to embark on her final years in the District at NAHS, and quickly engrossed herself in the NAHS community. By way of example, Plaintiff Doe participated in numerous extracurricular activities, including the Competitive School Choir and the all-girls Treble Choir.

58. For the first few years of her tenure at NAHS, Plaintiff Doe thrived both personally and academically, creating new groups of friends and proving herself as a bright and capable student. For reasons far beyond her control, however, Plaintiff's Doe's high school experience would change dramatically.

### b.  **Plaintiff Doe is Assaulted by A Fellow NAHS Student**

#### i.  The First Assault

59.     In or around April of 2017, Plaintiff Doe agreed to spend some time with one of her fellow NAHS students, Tuttle.

60.     Upon information and belief, Tuttle was a Sophomore student at the time who, upon information and belief, was a premiere athlete on NAHS' wrestling and track and field teams.

61.     Plaintiff Doe had met Tuttle through two mutual friends who were also on the wrestling team.

62.     On or about April 2, 2017, Plaintiff Doe and Tuttle were hanging out at Plaintiff Doe's grandmother's home. While in the house, Plaintiff Doe and Tuttle remained in the living room, sitting on the couch at a reasonable distance from one another and watching television.

63.     While watching television, Tuttle began to inappropriately touch and caress Plaintiff.

64.     Tuttle's behavior quickly escalated, and he shocked Plaintiff Doe by, upon information and belief, using his knowledge of wrestling to pin Plaintiff Doe to the ground.

65.     At such time, as Tuttle held Plaintiff Doe under him, and digitally penetrated Plaintiff Doe's vagina without Plaintiff Doe's consent.

66.     Plaintiff Doe was shocked; she did not know what to do and wanted desperately to escape.

67.     After the assault, Plaintiff Doe immediately sent a text message to Mother Doe's boyfriend, which contained approximately sixteen (16) "X"s.

68.     Plaintiff Doe sent this text message because, prior to the incident, Plaintiff Doe, Mother Doe and Mother Doe's boyfriend had implemented a system wherein the message "X" meant that the sender was in trouble and needed help quickly.

69.     Upon information and belief, Mother Doe's boyfriend received the text message, understood that Plaintiff Doe was in grave danger, and immediately left his job to pick Plaintiff Doe up.

70.     That day, Plaintiff Doe informed Mother Doe's boyfriend of the assault and, later that evening, disclosed the assault to Mother Doe.

71.     At the time that Plaintiff Doe spoke to Mother Doe, she strongly expressed her desire to keep what had happened private; Plaintiff Doe, then only fourteen (14) years old, was petrified of reporting the incident and did not know what to expect if it got out that Tuttle had assaulted her.

72.     Although Mother Doe wanted desperately to report the incident, she chose to respect her daughter's wishes and did everything she could to support her daughter through that trying time.

73.     Despite her desire to forget the assault and move on with her life, the pain and memory of the attack stayed with Plaintiff Doe and she could not help but to find other ways to express what happened.

74.     In or around May of 2017, Plaintiff Doe authored and submitted an essay for one of her classes entitled "This I Believe."

75.     In the essay, Plaintiff Doe discussed the April assault.

76.     Upon information and belief, after receiving Plaintiff Doe's essay, Plaintiff Doe's teacher became concerned and shared the essay with Plaintiff Doe's then guidance counselor.

77.     Plaintiff Doe's guidance counselor then contacted Mother Doe to discuss the essay.

78.     While speaking with the guidance counselor, Mother Doe informed the guidance counselor of the April assault and specifically named Tuttle as Plaintiff Doe's assailant.

79.     Upon information and belief, the guidance counselor was a mandatory reporter and therefore had an obligation to report Mother Doe's allegations of Plaintiff Doe's sexual assault to the proper authorities and to investigate the merits of Mother Doe's report.

80.     In response, the guidance counselor appeared shocked to learn of the assault. However, the guidance counselor did not offer Plaintiff Doe or Mother Doe any further resources or support.

81.     Indeed, the guidance counselor never advised Mother Doe of NAHS' policies or procedures for reporting, the available resources to Plaintiff Doe as an assault victim, or even the presence of a Title IX process within the District.

82.     Upon information and belief, the guidance counselor did not take any further steps to investigate Mother Doe's sexual assault complaint, nor did she take any steps to report the assault to the proper authorities, either internally or outside of NAHS.

83.     In essence, NAHS' guidance counselor ignored the fact that Plaintiff Doe had been sexually assaulted by one of NAHS' students, leaving Plaintiff Doe to fend for herself.

ii.   The Second Assault

84.     As a result of Defendants' utter failure to promptly (or in any way) act in response to the disclosure of Plaintiff Doe's first assault, Tuttle was permitted the opportunity to assault Plaintiff again, which Tuttle took full advantage of.

85.     Specifically, on or about October 18, 2017, Plaintiff Doe was hanging out with a friend playing video games. Tuttle was also there.

86.     At the time, Plaintiff Doe felt safe enough to be in the same room as Tuttle because her friend was also present.

87.     Although Plaintiff Doe had not told her friend about the prior assault, he still acted as a buffer between Plaintiff Doe and Tuttle; Plaintiff Doe made sure, as best she could, to not allow her friend to leave her alone in any room with Tuttle.

88.     At some point, Tuttle sat himself next to Plaintiff Doe on the couch. Almost immediately, Tuttle began to caress Plaintiff Doe's back over her sweatshirt. Tuttle then moved his hand under Plaintiff Doe's sweatshirt and under the back strap of her bra.

89.     At no point did Plaintiff Doe give Tuttle consent to touch her in any manner and tried to get Tuttle to stop; she slapped and pushed his hands away, and verbally told Tuttle to stop touching her. Tuttle would not stop.

90.     At some point, Plaintiff Doe's friend announced that he was leaving to go to a local Dunkin Donuts. Not wanting to be left alone with Tuttle, Plaintiff Doe stood up and signaled that she would join her friend.

91.     However, Plaintiff Doe was unfortunately not able to escape as Tuttle grabbed her and pulled her back down on the couch as she attempted to leave.

92.     Notably, Tuttle was much taller and stronger than Plaintiff Doe and had ample experience forcing someone into submission on account of his experience as a wrestler. Plaintiff Doe, a slight and petite young girl, was utterly helpless to escape his grasp.

93.     After prohibiting Plaintiff Doe from leaving, and upon Plaintiff Doe's friend's departure, Tuttle proceeded to grab at and pull Plaintiff Doe's pants down, along with his own.

94.     Following that, Tuttle then proceeded to flip Plaintiff Doe over and pin her to the floor face down.

95.     Tuttle then forcibly removed Plaintiff Doe's pants and underwear, and, with his hand pressed down against Plaintiff Doe's shoulder, proceeded to forcibly penetrate Plaintiff's vagina with his penis.

96.     Plaintiff Doe was shocked and utterly helpless; she did not possess the strength to stop what was happening to her.

97.     Plaintiff Doe tried to get Tuttle to stop, but he kept going and continued to rape Plaintiff Doe. Eventually, the horrible experience ended, and Plaintiff Doe rushed to put her clothes back on and leave the premises.

98.     Thereafter, Plaintiff Doe's friend arrived back and drove Plaintiff Doe home.

99.     While on the drive back home, Plaintiff Doe reported to her friend that Tuttle had raped her.

### c.   Plaintiff Doe Formally Reports Her Second Sexual Assault

100.    The day after the second assault, Plaintiff Doe reported the rape to her adjustment counselor Alison Colarusso ("Counselor Colarusso") at NAHS.

101.    Specifically, Plaintiff Doe told Counselor Colarusso that she needed to speak with her and that it was important.

102.    Thereafter, while in Counselor Colarusso's office, and with tears in her eyes, Plaintiff Doe told Counselor Colarusso everything that had transpired between her and Tuttle.

103.    Upon information and belief, Counselor Colarusso then told Plaintiff Doe's guidance counselor who called the North Andover Police Department ("NAPD").

104.    The NAPD sent an officer to take Plaintiff Doe's statement and Plaintiff Doe spoke with Police Officer Kara Caffrey ("Officer Caffrey") of the NAPD with Mother Doe present.

105.     Officer Caffrey took down Plaintiff Doe's statement and summary of the rape. At this time, Mother Doe informed Officer Caffrey of the first assault.

106.     Thereafter, Plaintiff underwent a SANE exam at the Lawrence Memorial Hospital.

107.     Upon information and belief, Officer Caffrey interviewed Tuttle in response to Plaintiff Doe's rape complaint.

108.     At such time, upon information and belief, Tuttle wholly denied that anything sexual occurred between himself and Plaintiff Doe, and falsely claimed that he had only "hugged" Plaintiff Doe. However, throughout the subsequent police investigation, Tuttle's story about what happened between himself and Plaintiff Doe changed numerous times.

### d.   Defendants Fail to Timely Investigate Plaintiff's Complaint Against Tuttle, Subjecting Plaintiff to Continued Harassment and Torment

109.     Despite having unequivocally received not one, but *two* reports from Plaintiff Doe, and/or Plaintiff Doe's family, that Plaintiff Doe had been assaulted twice by Tuttle in a mere six month time span, Defendants did not initiate any semblance of an investigation or take any substantive or sufficient action to protect Plaintiff Doe from further victimization.

110.     In fact, Defendants chose instead to treat Plaintiff Doe's reports of sexual assault perpetrated by one of their own male students as though they never existed; Defendants did not instigate any investigation and did not implement any interim protective measures to ensure Plaintiff Doe's safe continued education at NAHS.

111.     As a result, Tuttle was again allowed to victimize and torment Plaintiff further while on school premises and while at school sponsored and NAHS attended events.

**e.** **Plaintiff Suffers Egregious Bullying and Harassment Following her Report of Sexual Assault**

112.    Tuttle was aware of Plaintiff Doe's report of sexual assault by way of, at a minimum, the interview he had with Officer Caffrey.

113.    Upon information and belief, Tuttle disclosed to other students and individuals at NAHS that Plaintiff Doe had made a complaint of sexual assault against him.

114.    Since Defendants utterly failed to implement and/or enforce any interim safety measures to protect Plaintiff Doe at NAHS, Tuttle and his cohorts enjoyed free reign to torment and further victimize Plaintiff Doe.

115.    Plaintiff Doe was disgustingly, and publicly, called slanderous and demeaning names by fellow NAHS students in full view and earshot of NAHS employees, faculty, and administrators. Such names included, but were not limited to, "whore" and "slut".

116.    In addition, Tuttle bullied and harassed Plaintiff Doe in the hallways of NAHS during school hours.

117.    Tuttle regularly pointed at Plaintiff Doe in the hallways, loudly laughed at Plaintiff Doe, and made lewd gestures at her.

118.    Moreover, Plaintiff Doe was ostracized during school related events such as sports matches.

119.    By way of example, on or about December 16, 2017, Plaintiff Doe attended a wrestling tournament for the purpose of watching her friends from the NAHS wrestling team compete in the tournament. Notably, Tuttle also competed in the tournament.

120.    During the tournament, a male wrestling coach from the North Andover Middle School, Roy Nickerson ("Coach Nickerson"), observed Plaintiff Doe in the crowd and acted swiftly and inappropriately to publicly humiliate Plaintiff Doe.

121.     Specifically, Coach Nickerson stood up in front of the large crowd of spectators and the NAHS wrestling team and screamed out, "stay away from [her] (referring to Plaintiff Doe), they are bad news!"

122.     Plaintiff Doe was humiliated; she did not know how to defend herself and could not understand why a random, supposedly mature and grown up parent, and *agent of the District*, would go to such lengths to single her out and embarrass her in front of the NAHS community.

123.     Even more, Plaintiff Doe could not understand why no one from NAHS, including any of the other faculty and coaches in attendance, took any action to support or protect her. Indeed, the only people that came to Plaintiff Doe's aid at that time were her two friends on the wrestling team, who immediately ran over to comfort and support her.

124.     Plaintiff Doe immediately called Mother Doe and pleaded with her mom to join her at the wrestling match. Mother Doe drove to the tournament and spent the remainder of the evening watching the matches with her daughter.

125.     Plaintiff Doe's woes during the wrestling match did not end there, however.

126.     Indeed, Tuttle himself, along with his family members, further acted against Plaintiff Doe and lodged false accusations against Plaintiff Doe in a clear effort to get Plaintiff Doe in trouble.

127.     The day after the wrestling tournament, Plaintiff Doe's mother contacted VP Jackson via email to report that Plaintiff Doe was being subjected to further harassment and retaliation in connection with her report of sexual assault against Tuttle.

128.     However, same as was Defendants' response to Plaintiff Doe's sexual assault complaint, VP Jackson again ignored Mother Doe's complaint and allowed the torment, harassment, and bullying to continue under his watch.

129.    Indeed, the only response Plaintiff Doe or her family ever received regarding Tuttle's ongoing harassment was from Officer Caffrey, who advised Plaintiff Doe to *stay away from school events* or else **she** would get in trouble

130.    Eventually, Plaintiff Doe's school environment deteriorated so completely that she began to suffer mentally; Plaintiff Doe began to experience suicidal thoughts and ideations as a result of the daily torment from her peers, and the obvious disinterest Defendants displayed in helping to protect her.

131.    As a result, in or around January of 2018, Plaintiff Doe was hospitalized for in-patient treatment for nine days at Union Hospital.

132.    At the end of her treatment, Plaintiff Doe's physicians recommended that she undergo a forty-five (45) day outplacement assessment ("Outplacement Assessment") to, upon information and belief, determine an alternate educational environment for Plaintiff Doe to return to.

133.    The Outplacement Assessment was necessary as the environment within NAHS was extremely distressing and triggering for Plaintiff Doe, and posed a danger to her health and safety.

134.    In light of the medical experts' advise, Plaintiff Doe underwent the Outplacement Assessment which determined that Plaintiff Doe suffered from severe trauma from the sexual assaults and therefore needed to be placed in a therapeutic educational environment where she could receive appropriate attention, care, and support.

f.    **Defendants' Agents Directly Attack and Belittle Plaintiff Doe as a Rape Victim**

135.    Mother Doe immediately told Coordinator Gilligan about the hospital's orders and the result of Plaintiff Doe's Outpatient Assessment.

136.     Mother Doe was hopeful that Coordinator Gilligan, then the *officer in charge of enforcing Title IX mandates at NAHS*, would take the matter seriously and step in to help her daughter. Sadly, however, Coordinator Gilligan could not be bothered enough to even reply.

137.     Thereafter, on or about February 1, 2018, NAHS held a placement meeting with Plaintiff Doe and her mother which was conducted by Joseph Diorio, NAHS' then Director of Special Education ("Director Diorio").

138.     During the placement meeting, Director Diorio displayed a despicable lack of empathy towards Plaintiff Doe and openly belittled and made light of the harm Plaintiff Doe had suffered as a result of the assaults perpetrated by Tuttle.

139.     Plaintiff Doe and Mother Doe were stunned; they left the meeting feeling betrayed and discouraged, and without any shred of information about how Defendants intended to address Plaintiff Doe's need for a new school placement.

140.     As a result of Defendants' utter failure to provide Plaintiff Doe with suitable accommodations and an alternative placement, Plaintiff Doe requested to receive Temporary Home or Hospital Education.

141.     Plaintiff Doe believed that home study was the only viable way, short of adequate placement at another educational institution – which Defendants did not seem willing to do despite the medical need for it – to stay up to date on her studies while also avoiding any further contact with Tuttle.

   **g.   Defendants FINALLY Perform a Perfunctory and Sham Investigation into Plaintiff's Assaults**

142.     On or about February 7, 2018, Assistant Principal Young contacted Mother Doe and curiously requested permission to instigate a Title IX Investigation in response to Plaintiff Doe's prior reports of sexual assault.

143.    At such time, Mother Doe reminded Assistant Principal Young that she had been asking and pleading for Defendants to investigate Plaintiff's rape since as early as October 2017, and that, in fact, Defendants had known about Tuttle's first assault on her daughter since as early as May of 2017.

144.    Mother Doe granted Defendants permission to *finally* investigate her daughter's assaults.

145.    Rather than hire an independent outside investigator, Defendants chose instead to conduct the investigation entirely internally and appointed Assistant Principal Randall to run the Title IX Investigation.

146.    Upon information and belief, it was Assistant Principal Young who chose to appoint Assistant Principal Randall to investigate Plaintiff Doe's report of sexual assault against Tuttle.

147.    Upon information and belief, Assistant Principal Randall was not properly qualified nor trained to conduct a sexual assault investigation and was only haphazardly chosen by Defendants to lead the investigation into Plaintiff Doe's complaint.

148.    Despite seeking and being granted permission to investigate Plaintiff Doe's complaint on February 7, 2018, it was not until *April 3, 2018* that Plaintiff Doe was interviewed in connection with the investigation.

149.    Upon information and belief, between February 7, 2018 and April 3, 2018, Defendants had not taken a single step to advance the investigation or otherwise look into Plaintiff Doe's complaint. Indeed, upon information and belief, the only reason why Plaintiff Doe's interview was ever scheduled was in response to constant and repeated requests and inquiries regarding the status of the investigation from Mother Doe.

150.     Plaintiff Doe met with Assistant Principal Randall and Assistant Principal Young on or about April 3, 2018 for her interview as the complainant in the ongoing investigation.

151.     Curiously, even though Assistant Principal Randall had been assigned as the investigator, it was Assistant Principal Young who led the interview and primarily questioned Plaintiff Doe.

152.     Notably, at no point was Plaintiff Doe – a minor at the time – informed of her right and/or ability to have a guardian or other advocate present during her interview. Instead, Defendants opted to confront and interrogate a minor aged rape victim alone and without any adult or guardian's guidance.

153.     During her interview, Plaintiff Doe recounted the events of the assaults and expressed the utter turmoil and havoc Tuttle had wreaked on her life.

154.     In addition, Plaintiff Doe gave Assistant Principal Randall and Assistant Principal Young numerous specific examples of the ways in which Tuttle and other members of the NAHS community had retaliated against her for reporting the assaults, and had continued to harass and retaliate against her while at school and during school events.

155.     Curiously, during the interview, Assistant Principal Young and Assistant Principal Randall also interrogated Plaintiff Doe about her actions towards Tuttle, seemingly inferring that it was Plaintiff Doe who had wronged Tuttle.

156.     Plaintiff Doe was confused why she was being asked about her behavior and conduct towards Tuttle, as she believed – and was never told otherwise – that the purpose of the interview and investigation was to determine the propriety of Tuttle's actions towards her.

157.     Notably, at no point did Defendants offer Plaintiff Doe the opportunity to provide evidence or witnesses to support her allegations against Tuttle.

158.    As it would turn out, the April 3rd interview would be the only time Plaintiff Doe was questioned or even spoken to by any NAHS representative about the investigation or her complaint.

159.    Moreover, not only did Defendants not meet with Plaintiff Doe again about the investigation, Defendants also never advised Plaintiff Doe of any evidence gathered during their investigation despite several attempts to obtain a status update on the investigation by Mother Doe.

**h.    Defendants Outrageously Ignore Plaintiff's Report of Sexual Assault and Clear Tuttle of Any Wrongdoing**

160.    On or about April 13, 2018, Plaintiff received two notices of outcome.

161.    The first outcome letter related to a bullying complaint lodged by Tuttle against Plaintiff Doe.

162.    Amazingly, at no point did anyone from NAHS inform Plaintiff Doe that Tuttle had lodged a bullying complaint, or any type of complaint, against her. Moreover, at no point was Plaintiff Doe specifically interviewed in relation to Tuttle's complaint against her, thereby depriving Plaintiff Doe of the opportunity to defend herself against Tuttle's accusations.

163.    Indeed, the first outcome letter was the first time anyone from NAHS had ever mentioned the bullying complaint to Plaintiff Doe.

164.    In the bullying outcome letter, Assistant Principal Randall detailed alleged actions taken by Plaintiff Doe which Tuttle reported caused him to be "uncomfortable and anxious." Such actions included Plaintiff Doe's attendance at the wrestling tournament and Plaintiff Doe's alleged general conversations with other NAHS students.

165.    Assistant Principal Randall ultimately determined that Plaintiff Doe was not responsible for the accusations against her.

166.    The second outcome letter was related to a complaint of "general sexual harassment" by Plaintiff Doe against Tuttle.

167.    Apparently, Defendants had unilaterally determined to change Plaintiff Doe's clear and unequivocal complaints of sexual assault, retaliation, and harassment into simply a "general sexual harassment" complaint without consent from, or even notice to, Plaintiff Doe.

168.    With respect to Defendants' finding related to Plaintiff Doe's sexual assault complaint, Assistant Principal Young's determination and report were nothing short of egregious.

169.    In the sexual assault outcome letter, Assistant Principal Young improperly and falsely noted that Plaintiff Doe's complaint was one of "general sexual harassment" and found that, despite being provided specific examples of the ongoing torment Tuttle subjected Plaintiff Doe to following her report in October of 2018, "the investigation…revealed no subsequent instances of inappropriate comments, physical acts, or gestures directed at [Plaintiff Doe] or targeting [Plaintiff Doe] by [Tuttle] at NAHS or elsewhere…"

170.    Moreover, the sexual assault outcome letter astonishingly did not mention Plaintiff Doe's sexual assault *at all!* Indeed, the only reference to Plaintiff Doe's sexual assault was a passing comment in the bullying outcome letter.

171.    In addition, the sexual assault outcome letter did not make any mention of Plaintiff Doe's allegations of retaliation.

172.    After clearly dismissing and failing to even consider pertinent and damning evidence supporting Plaintiff Doe's complaint of sexual assault, such as the sexual assault itself, Assistant Principal Young absurdly found Tuttle not responsible of the allegations against him.

173.    As such, Tuttle suffered no disciplinary actions for his multiple sexual assaults of, harassment towards, and retaliation against Plaintiff Doe.

174.     Moreover, in light of the simultaneous notice of the two outcomes, it was clear that instead of properly dedicating the resources and time to Plaintiff Doe's complaint, Defendants chose instead to cut corners and investigate Plaintiff Doe's complaint against Tuttle simultaneously with Tuttle's complaint against Plaintiff Doe.

175.     Following the alleged investigation, which by all counts lasted approximately ten (10) days, NAHS attempted to victimize Plaintiff Doe even further and tried to force Plaintiff Doe to sign and agree to a "School Safety Plan".

176.     The School Safety Plan which was presented to plaintiff Doe for her signature outside the presence of Plaintiff Doe's parent and/or adult guardian, would have effectively barred Plaintiff Doe from freely moving about NAHS, and significantly limited Plaintiff Doe's access to extra-curricular activities.

177.     Notably, Plaintiff Doe was never provided a copy of any agreement Tuttle was similarly forced to sign barring him from further contacting or harassing Plaintiff Doe again.

178.     Despite Defendants clear intent to restrict Plaintiff Doe from equal and unfettered access to an appropriate educational environment and educational opportunities, Defendants would ultimately not be given the opportunity to enforce the School Safety Plan.

### i.   Defendants Force Plaintiff to Attend a Sub-Standard School Against Medical Recommendations

179.     Throughout the Spring 2018 term, Mother Doe continued to advocate for Plaintiff Doe's placement in a more appropriate school, as per the results of the Outplacement Assessment.

180.     Mother Doe consistently proposed appropriate schools and facilities to Defendants where Plaintiff Doe could safely be placed for the remainder of her schooling.

181.     Despite Mother Doe's efforts, however, Defendants adamantly refused to assist in placing Plaintiff Doe in an appropriate school environment.

182.    Indeed, at one particular meeting, Defendants' agents went so far as to not only question Plaintiff Doe's need for appropriate placement, but to outright challenge Plaintiff Doe's status as a sexual assault victim.

183.    Specifically, on one occasion, Plaintiff Doe, accompanied by her mother and several advocates, met with Director Diorio and Sandra Connor, the District's Outplacement Coordinator ("District Coordinator Connor") to discuss a new placement.

184.    During the meeting, seemingly fed up with Mother Doe's constant reminder to them that her daughter was a traumatized sexual assault victim, District Coordinator Connor asked Director Diorio "is she (referring to Plaintiff Doe) a reliable reporter?"

185.    In response, Director Diorio glanced at Plaintiff Doe, shook his head, and whispered "no".

186.    After seeing and hearing this, Plaintiff Doe burst into tears as Mother Doe and Plaintiff Doe's various advocates erupted in uproar towards Director Diorio and District Coordinator Connor's insensitive and appalling exchange.

187.    Defendants continued to fight against finding Plaintiff Doe proper placement in a therapeutic learning environment.

188.    In or around March of 2018, Plaintiff Doe was forced to begin attending SEEM Collaborative, an assessment and intervention center in Stoneham, Massachusetts ("SEEM").

189.    Plaintiff Doe attended SEEM through the 2019-2020 school year.

190.    Throughout her tenure at SEEM, Plaintiff Doe repeatedly reported that she did not feel safe or supported by the faculty and was the subject of repeated unseemly and unwelcome remarks and contact by SEEM's male attendees.

191.    Mother Doe continued to complain about Plaintiff Doe's placement but, having washed their hands of Plaintiff from NAHS, Defendants showed no interest in addressing the problem.

### III.    Plaintiff Smith's Experiences at NAHS

#### a.    Background Information

192.    Plaintiff Smith commenced attending NAHS as a freshman student in the Fall of 2015. Plaintiff Smith attended NAHS until her graduation in June of 2019.

#### b.    Tuttle Assaults Plaintiff Smith in the Backseat of His Car

193.    Plaintiff Smith was first introduced to Tuttle by a mutual friend and NAHS, classmate "Student X".

194.    On or about April 2, 2018, Plaintiff Smith arranged to hang out with both Tuttle and Student X after school. At the time, Plaintiff Smith was unaware of Tuttle's prior assault on Plaintiff Doe and, in fact, had never previously known of or spent time with Tuttle.

195.    On the afternoon of April 2nd, Student X texted Plaintiff Smith and advised that he unfortunately would not be able to meet her and Tuttle that afternoon.

196.    Although Plaintiff Smith was disappointed that Student X could no longer join, she still decided to keep the plans with Tuttle and hang out for the afternoon.

197.    Accordingly, Tuttle picked Plaintiff Smith up from her home at around 4:30 or 5:00 p.m.

198.    At such time, Tuttle, who was driving a Jeep truck, drove Plaintiff Smith to a neighboring town and then back to North Andover.

199.    During the drive, Plaintiff Smith and Tuttle engaged in, what Plaintiff Smith considered to be, innocent conversation.

200.     Upon returning to North Andover, Tuttle curiously drove Plaintiff Smith down Sharpners Pond Road and parked at the end of a parking lot near the entrance to the Boxford State Forest.

201.     By that time of night, the area was very dark and the road was scarcely travelled.

202.     After parking, Tuttle got into the backseat of the Jeep and forced Plaintiff Smith to join him.

203.     At such time, Tuttle began to inappropriately touch and caress Plaintiff Smith; Tuttle tried to force his hands into the holes in Plaintiff Smith's jeans and slid his hands towards Plaintiff Smith's genital area.

204.     Trying to deter Tuttle, Plaintiff Smith blurting out the first thing she could think to say that might stop him, and told Tuttle that she was menstruating.

205.     Tuttle only responded, "that's okay; I'm not going to finger you."

206.     Plaintiff Smith then told Tuttle directly to "stop" and pulled his hand away.

207.     After Plaintiff Smith's rejection, Tuttle turned the heat up in his Jeep, making the inside of the vehicle nearly unbearably warm.

208.     Plaintiff Smith, who was wearing a sweatshirt at the time, felt incredibly hot but did not, under any circumstances, want to remove her sweatshirt.

209.     Soon after adjusting the car's thermostat, Tuttle demanded that Plaintiff Smith remove her sweatshirt. Plaintiff Smith refused to do so and told Tuttle she would not.

210.     Tuttle then forced his hands under Plaintiff Smith's shirt and groped Plaintiff Smith's breasts.

211.    Despite Plaintiff Smith's clear rejection of him, Tuttle persisted to try and force himself upon Plaintiff Smith. Plaintiff Smith fought off Tuttle as hard as she could and continuously removed his hands from her body and private areas.

212.    Tuttle was fighting so desperately to take advantage of Plaintiff Smith that she could see the veins in his arms straining from the amount of strength he was trying to exert on her.

213.    Plaintiff Smith pleaded with Tuttle to stop but he would not cease molesting her chest and private area.

214.    Plaintiff Smith tried again and forcefully told Tuttle "**NO**". At that time, Tuttle removed his hands from Plaintiff Smith's breasts only to grab Plaintiff Smith by her legs and pull her underneath him.

215.    Tuttle proceeded to climb on top of Plaintiff Smith, pinning her far slighter body beneath his; Plaintiff was rendered defenseless in the small backseat of the vehicle.

216.    While on top of Plaintiff Smith, Tuttle attempted to remove Plaintiff Smith's jeans, but was only able to undo the button at the top of her pants.

217.    Then, Tuttle removed his own pants and exposed his penis to Plaintiff Smith.

218.    Tuttle repeatedly tried to force Plaintiff Smith to perform oral sex on him but each time Plaintiff Smith refused and tried desperately to escape.

219.    Tuttle proceeded to inappropriately touch and attempt to force Plaintiff Smith to perform oral sex for approximately thirty minutes.

220.    After Plaintiff Smith's continued refusal and pleas for Tuttle to stop, Tuttle began to thrust his exposed penis against Plaintiff's vaginal area, simulating sex. Plaintiff Smith repeatedly told Tuttle that she would not have sex with him but Tuttle would not stop.

221.    Indeed, it was not until Plaintiff Smith kneed Tuttle in his groin area and physically fought back against him with all the strength that she could muster that Tuttle finally ceased his assault on Plaintiff Smith.

222.    Thereafter, Tuttle removed himself from Plaintiff Smith.

223.    Appallingly, Tuttle attempted to laugh off the assault and repeatedly called it a "joke", thereby evidencing how seriously (or rather not seriously) he had taken his harmful and criminal actions against Plaintiff Smith.

224.    In response, Plaintiff Smith repeatedly told Tuttle it was not a joke.

225.    Tuttle then drove Plaintiff Smith back home.

226.    Once back at Plaintiff Smith's home, Tuttle, upon information and belief, recognizing and acknowledging what he had done to Plaintiff Smith, asked Plaintiff Smith if she knew how to "keep a secret".

227.    Tuttle proceeded to tell Plaintiff Smith that after a prior similar incident, his life had been negatively impacted and he did not want that to happen again.

228.    Upon information and belief, the prior similar incident Tuttle was referring to was his prior assault of Plaintiff Doe.

229.    Upon information and belief, Tuttle was attempting to threaten and intimidate Plaintiff Smith into not reporting the assault he had just perpetrated against her.

230.    Plaintiff Smith could hardly process what had just happened to her and what Tuttle was saying; she exited the car and tried to run inside her home.

231.    However, as Plaintiff Smith exited Tuttle's vehicle, he again folded down the seats and attempted to force Plaintiff Smith back in the backseat of his Jeep.

232.    Upon information and belief, Tuttle intended to again try and forcibly rape Plaintiff Smith after reaching her home.

233.    Luckily, Plaintiff Smith was able to escape Tuttle and ran into her home.

234.    Following the assault, Plaintiff Smith and Tuttle exchanged text messages wherein Plaintiff Smith confronted Tuttle about his behavior and repeatedly reminded Tuttle that his actions were not funny, not a joke, and that she had told him "no."

235.    In the text messages, Tuttle conceded that it was "his fault" and then ceased answering after Plaintiff Smith continued to confront him with his criminal actions.

### c.    Plaintiff Smith Reports Her Assault and Tuttle Is Placed Under Arrest

236.    The day after the assault, Plaintiff Smith reported what had happened to Counselor Colarusso. Specifically, Plaintiff Smith sent an email to Counselor Colarusso that stated "something bad" had happened and asked for a formal meeting.

237.    Thereafter, Plaintiff Smith met with Counselor Colarusso and Sarah Hickey, another agent in NAHS' guidance department ("Counselor Hickey"). At such time, Plaintiff Smith told Counselor Colarusso and Counselor Hickey of the assault by Tuttle.

238.    In response, Counselor Colarusso and Counselor Hickey told Plaintiff Smith that, legally, they had to report the assault.

239.    Thereafter, Counselor Colarusso and Counselor Hickey led Plaintiff to Assistant Principal Randall's office and called Plaintiff Smith's grandmother on speakerphone.

240.    While on the call with Plaintiff Smith's grandmother, Assistant Principal Randall simply told Plaintiff Smith's grandmother that "something happened" and advised she come to NAHS immediately.

241.    When Plaintiff Smith's grandmother arrived at NAHS, she was horrified by what she was confronted with; she was brought to a large conference room filled with multiple people, including Plaintiff Smith, Assistant Principal Randall, several school counselors, and representatives of the NAPD.

242.    It was at that time, in a room crowded with strangers, that Plaintiff Smith made her formal complaint of sexual assault and issued her formal statement to the NAPD.

243.    Appallingly, Assistant Principal Randall refused to stay for the entirety of the meeting because, apparently, she had a more important things to do then to listen to one of her students report her sexual assault by another school attendee.

244.    Following the meeting, Defendants allegedly instigated an investigation into Plaintiff Smith's sexual assault complaint.

245.    However, no one from NAHS or the District ever contacted or interviewed Plaintiff Smith about the events of the assault.

246.    Instead, despite not staying for the entire, or even majority of, the meeting to hear Plaintiff Smith's police statement, Assistant Principal Randall used Plaintiff Smith's statement to the NAPD as if it were the same as a formal interview with Plaintiff Smith during an investigation.

247.    Moreover, at no point did anyone from NAHS contact Plaintiff Smith or her guardian (her grandmother) in order to explain the investigatory process or to gather further information or potential evidence.

248.    Following Plaintiff Smith's complaint to the NAPD, Tuttle was placed under arrest.

249.    Upon information and belief, Tuttle invoked his fifth amendment right not to incriminate himself during his interview with the NAPD and did not respond to questioning regarding the assault on Plaintiff Smith.

**d.  Defendants Clear Tuttle of Plaintiff Smith's Assault on the Same Day They Clear Tuttle of the Assault on Plaintiff Doe**

250.    On or about April 13, 2018, Defendants issued Plaintiff Smith a notice of outcome letter related to her report of sexual assault against Tuttle.

251.    In Plaintiff Smith's outcome letter, Assistant Principal Randall falsely noted that she had interviewed Plaintiff Smith.

252.    In fact, Assistant Principal Randall had never bothered to speak at all to Plaintiff Smith about the assault and chose instead to take the lazy way out and use Plaintiff Smith's report to the police in place of a formal interview.

253.    Outrageously, despite never formally interviewing Plaintiff Smith and, upon information and belief, never receiving a defense to the complaint from Tuttle, Defendants found Tuttle not responsible for the assault against Plaintiff Smith.

**e.  Defendants Force Plaintiff Smith to Sign a School Safety Plan**

254.    Similar to what Defendants attempted to force Plaintiff Doe into entering, following the outcome of the laughable investigation allegedly conducted into Plaintiff Smith's sexual assault report, Defendants forced Plaintiff Smith to enter into a School Safety Plan in order to remain a student at NAHS.

255.    Following the conclusion of the supposed investigation into Plaintiff Smith's sexual assault complaint, Defendants blindsided Plaintiff Smith and demanded that she sign the School Safety Plan or otherwise leave NAHS.

256.    The School Safety Plan, which was provided to Plaintiff Smith, then a minor, to sign outside the presence of and without the consultation of a legal guardian, severely restricted Plaintiff Smith's ability to freely move about the school and engage in NAHS events and opportunities.

257.    The School Safety Plan warned that any violation of the plan, meaning any attempt by Plaintiff Smith to deviate from her restricted range of movement and participation in NAHS activities, would result in disciplinary action.

258.    Plaintiff Smith was forced to sign the School Safety Plan in order to continue her enrollment at NAHS.

259.    When Plaintiff Smith, who was provided the School Safety Plan by Assistant Principal Randall, asked about the restrictions on Tuttle, Assistant Principal Randall advised that there was nothing Defendants could do unless Tuttle was prosecuted criminally.

260.    As a result, Tuttle was permitted to remain at NAHS and freely roam the hallways callously exclaiming "I beat it!" in reference to Plaintiff Smith's criminal and internal school complaint.

**f.  <u>Defendants Allow Plaintiff Smith to Endure Further Harassment by Tuttle</u>**

261.    After forcing Plaintiff Smith to sign the School Safety Plan, Defendants then thrust her back into the NAHS population without instituting any credible or sufficient measures to ensure her safety, even though they knew (or at least reasonably should have known) that she was likely to run into Tuttle again.

262.    Indeed, Plaintiff Smith did have many more interactions with Tuttle following the April 13 outcome letter.

263.    Upon information and belief, Tuttle purposefully sought out Plaintiff Smith in order to further torment and harass her at school, similar to his behavior towards Plaintiff Doe following her assault complaint to NAHS.

264.    Tuttle routinely stalked Plaintiff Smith in the hallways and, whenever possible, shouted at her, pointed at her, and make gruesome and taunting facial expressions towards her.

265.     Plaintiff Smith was forced to encounter Tuttle nearly every day at school and was subjected to more and more harassment at his hands.

266.     Plaintiff Smith repeatedly reported Tuttle's behavior to Defendants to no avail; no steps were ever taken to address Tuttle's continued harassing behavior and Plaintiff Smith was left to fend for herself.

267.     As a result, Plaintiff Smith began to feel increasingly less safe at NAHS and was eventually forced to drop out of regular classes in an effort to escape from Tuttle.

g.     **Plaintiff Smith Enrolls in Night Classes and Is Penalized and Threatened by Defendants**

268.     In or around the Winter of 2018, Plaintiff Smith enrolled in the Scarlett Knight Academy (the "Academy"), an alternative school run by the District which offered evening classes at NAHS.

269.     Plaintiff Smith enrolled in the Academy as a last-ditch effort to escape the daily torment and retaliation she faced from Tuttle which was repeatedly ignored and dismissed by Defendants.

270.     However, Plaintiff Smith learned that her life in the Academy would be no better than her life on the regular NAHS schedule.

271.     Upon enrolling in the Academy, Defendants again forced Plaintiff Smith to sign and agree to an overly restrictive updated night School Safety Plan.

272.     Specifically, upon enrolling in the Academy, Plaintiff Smith met with the Academy's Director.

273.     At such time, the director presented Plaintiff Smith with the new Night School Safety Plan and rushed Plaintiff Smith to sign the new contract; the director would not allow Plaintiff Smith to read or review the new plan in depth and notably again met with Plaintiff Smith

– a minor – without her legal guardian present in order to force her into signing a binding agreement with NAHS.

274.    The new Night School Safety Plan required Plaintiff Smith to not only avoid travelling the main pathways of NAHS, but for Plaintiff Smith to also avoid the gymnasium steps at any time during the evening.

275.    On its face, the Night School Safety Plan restricted Plaintiff Smith's movements and freedom to attend and move about NAHS while enrolled in the Academy.

276.    After forcing Plaintiff Smith to sign the Night School Safety Plan, the director thereafter *threatened* Plaintiff Smith that if **she** caused any problems – impliedly like the 'problems' she caused when she lodged her sexual assault complaint – then the director would force her back into regular day school with Tuttle.

277.    Plaintiff Smith was shocked and afraid; she went on doing her best to keep a low profile and stay out of trouble.

278.    Unfortunately for Plaintiff Smith, her enrollment in the Academy did not remedy the harassment she suffered at the hands of Tuttle. In fact, the behavior only got worse.

279.    While attending courses at the Academy, Plaintiff Smith was frequently followed around NAHS by one of NAHS' school safety officers, Officer William Enright ("Officer Enright").

280.    When Plaintiff Smith confronted Officer Enright and asked why he was consistently following her around, Officer Enright all but admitted that it was to ensure *Tuttle's* protection.

281.    Indeed, Officer Enright told Plaintiff Smith he was following her around to ensure she was abiding by the terms of the Night School Safety Plan and not disturbing Tuttle because "he needs an education too."

282.    Notably, to Plaintiff Smith's knowledge, no one from NAHS was similarly following and watching Tuttle to ensure Plaintiff Smith's protection as a student.

283.    In addition, Tuttle repeatedly made false reports against Plaintiff Smith to Defendants which erroneously alleged that Plaintiff Smith harassed him and violated the terms of the Night School Safety Plan.

284.    By way of example only, on one occasion, Tuttle falsely reported that Plaintiff Smith stalked him at the gymnasium after he had briefly observed her leaving through the exit closest to the gymnasium while he was inside.

285.    At no point during that incident, or at any other time, did Plaintiff Smith stalk or even want to be anywhere near Tuttle.

286.    Still, despite having ignored all of Plaintiff Smith's credible complaints of harassment, retaliation, and assault against Tuttle, Defendants immediately acted against Plaintiff Smith, issued Plaintiff Smith disciplinary action and warnings, and went so far as to threaten to expel her from the Academy all together.

287.    For the remainder of Plaintiff's time as a student in the District, she was forced to walk on eggshells, all the time knowing that although Defendants were willing to jump through hoops to protect and defend Tuttle, there would be NO ONE willing to stand up for her.

288.    Indeed, whenever Plaintiff Smith's grandmother pushed the issue to Coordinator Gilligan – by that time named the District's Superintendent – the only response she received was that the issue was out of Defendants' hands and that the real culprit to blame was the court system.

IV. **The School Committee Steadfastly Defends Their Agents' Utterly Unlawful Behavior**

289.    In or around 2019, following Tuttle's arrest for the sexual assault of a high school aged student in the State of New Hampshire, many news outlets began reporting on Defendants' prior procedures and actions in response to sexual assault victims' complaints within the District.

290.    At such time, Defendants' egregious mishandling of sexual assault complaints came to light and, upon information and belief, Defendants were forced to find some explanation for their utter lack of attention and action to *female* assault victims at NAHS.

291.    However, Defendants' response to public media allegations that NAHS mishandled complaints of sexual assault proved just as insufficient as the Defendants' actions to investigate Plaintiffs' complaints.

292.    Indeed, in one article, Defendants are cited as conceding that they did not investigate the reports of sexual assault because they were not obligated to under the law because Tuttle had not been charged or convicted of any felony.

293.    These excuses were only exacerbated by the School Committee, whose members steadfastly supported the District Defendants' despicable actions despite public outcry and information brought forth by the Plaintiffs.

294.    Indeed, during a March 2019 meeting of the School Committee, several North Andover parents and community members voiced their strong and serious concerns over the handling of sexual assault complaints against Tuttle at NAHS.

295.    In response, the School Committee denied any wrongdoing and wholeheartedly supported their administrators and faculty.

296.    Despite a continued heightened community awareness, which included a news highlight of NAHS's blatant failure to hold Tuttle responsible, as well as the grossly unjust safety plans NAHS forced upon the victims, Defendants still failed to respond.

297.    Even a walk out, staged by NAHS students to draw awareness to their discontent over NAHS' sexual assault policies and handling of the sexual assault claims, did not cause any action or change.

298.    To date, despite public outcry and repeated complaints from parents and students specifically related to sexual assaults committed by Tuttle against not only Plaintiffs, but additional girls at NAHS, Defendants have refused to admit any wrongdoing and have gone so far as to attack those crying out for justice and change.

V.      **The District Defendants Attempt to Cover Their Tracks**

299.    Following public outcry, and, upon information and belief, in an attempt to clear their name, the District Defendants retained an independent attorney, Jeffrey M. Sankey of Sankey Law Offices ("Sankey") in Braintree, Massachusetts to conduct an allegedly independent evaluation of NAHS Policies and Practices. Sankey then rendered a report outlining the conclusions of his supposed investigation (the "Sankey Report").

300.    Both Plaintiff Doe's and Plaintiff Smith's sexual assaults were very shortly summarized in the Sankey Report.

301.    The Sankey Report contained numerous errors and contradictions, likely due to erroneous information supplied by Defendants, and failed to characterize blatant behavior by Tuttle as retaliation, which is plainly prohibited by NAHS Policies.

302.    The Sankey Report wrongly found that "[NAHS] implemented necessary and appropriate polices regarding school discipline and harassment" because of the absence of several policies and procedures.

303.    Additionally, the Sankey Report also erroneously found that NAHS "properly applied applicable school discipline policies in response to the allegations made" when, indeed, the findings of fact and conclusions drawn were wholly unsupported by the evidence.

**VI.    Plaintiffs are Left in Shambles**

304.    As a result of their respective assaults, Plaintiffs have suffered tremendous emotional trauma and have found their lives and themselves forever altered.

305.    Plaintiffs' trauma was only exacerbated by Defendants' demonstrated disinterest and indifference to their plight, and Defendants' utter failure to offer either Plaintiff Doe or Plaintiff Smith any semblance of support.

306.    Both Plaintiffs have undergone significant mental health treatment which continues through the present and which is not foreseeably concluding any time in the near future.

307.    As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered significant emotional injuries. Plaintiffs have been traumatized, deprived of happiness and a feeling of security, and suffers daily from feelings of hopelessness and the inability to move on in their lives.

**CAUSES OF ACTION**
**AS AND FOR A FIRST CAUSE OF ACTION**
*(Discrimination in violation of Title IX:*
*Hostile Education Environment – Sexually Hostile Culture)*

308.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

309.    As set forth in detail above, the District Defendants actively created and/or condoned and/or were deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices that included, but were not limited to: (i) purposefully ignoring and/or condoning a social culture of sexual violence and harassment perpetrated by its male students, specifically and especially Tuttle; (ii) intentionally ignoring and/or delaying investigation(s) of complaints of sexual misconduct and rape perpetrated against its female students; (iii) failing to fulfill their obligations as mandatory reporters following receipt of complaints of sexual misconduct and/or sexual assault; (iv) failing to thoroughly, objectively and sufficiently investigate complaints of sexual misconduct and/or sexual assault; (v) intentionally misrepresenting evidence gathered during investigations into complaints of sexual misconduct and/or sexual assault; (vi) providing male students accused of sexual misconduct and/or sexual assault unwarranted leniency in the adjudication of Title IX complaints brought by female students; and (vii) lashing out at female victims following reports of sexual misconduct and/or sexual assault and/or sexual harassment.

310.    Defendants' sexually hostile custom, policies and practices were a proximate cause of Plaintiffs' subjection to months of sexual harassment, retaliation, and bullying.

311.    The sexual harassment that Plaintiffs suffered was so severe, pervasive, and objectively offensive that it effectively barred their access to educational opportunities and benefits.

312.    As a direct and proximate result of Defendants' creation of and deliberate indifference to its sexually hostile educational environment, Plaintiffs have suffered, and continue to suffer, damages and injuries for which Defendants are liable.

## AS AND FOR A SECOND CAUSE OF ACTION

*(Gender Discrimination in violation of Title IX: Deliberate Indifference to Plaintiffs' Rapes)*

313.     Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

314.     Title IX prohibits federally funded institutions from engaging in discrimination on the basis of sex.

315.     Sexual harassment is included within the meaning of "discrimination" under Title IX.

316.     Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs.

317.     A single instance of rape is sufficiently severe to create a hostile education environment.

318.     Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendants may be held liable under Title IX.

319.     Defendants were aware of Plaintiff Doe's report of sexual assault as early as May 2017 and, without contest, had received a formal report of sexual assault from Plaintiff Doe in October of 2017.

320.     Defendants deliberately chose not to investigate Plaintiff Doe's report until April of 2018 at which time Defendants rushed to investigate both Plaintiff Doe's and Plaintiff Smith's complaints of sexual assault, resulting in demonstrably deficient and erroneous findings exonerating Tuttle for his actions.

321.    In response to Plaintiff Smith's report of sexual assault, Defendants' intentionally and willfully failed to perform any interviews or substantive investigation into Plaintiff Smith's report and unjustifiably found against Plaintiff Smith.

322.    Further, Defendants intentionally ignored and tacitly condoned further harassment and retaliation perpetrated against Plaintiffs by failing and/or refusing to investigate Plaintiffs' further complaints of harassment and retaliation against Tuttle and other members of the Defendants' community.

323.    Defendants' failure to properly investigate the assaults, conduct a timely and unbiased investigation and hearing or find Tuttle responsible for the assaults was intentional and unreasonable.

324.    Defendants' actions, and/or lack thereof, constitute "deliberate indifference" in violation of Title IX.

325.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiffs' rapes and Defendants' violations of Title IX, Plaintiffs were exposed to continued harassment by Tuttle and others which sexual harassment was so severe, pervasive, and objectively offensive that it effectively barred Plaintiffs equal access to meaningful educational opportunities and benefits including, but not limited to, academics, on-campus events and activities, and extracurricular activities.

326.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiffs' rapes and Defendants' violations of Title IX, Plaintiffs were subjected to a hostile education environment.

327.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiffs' rapes and Defendants' violations of Title IX, Plaintiffs have suffered and continue to suffer significant, severe, and ongoing emotional distress and mental anguish.

328.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiffs' rapes and Defendants' violations of Title IX, Plaintiffs suffered damages and injuries for which Defendants are liable.

## AS AND FOR A THIRD CAUSE OF ACTION
*(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)*

329.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

330.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the Constitution.

331.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the constitution and laws, shall be liable to the party injured in an action law, suit in equity, or other proper proceeding for redress…

332.    A person has a protected property interest in pursuing their education, as well as future educational and employment opportunities and occupational liberty, of which they cannot be deprived without due process.

333.    It is well established that Fourteenth Amendment due process protections are required in educational disciplinary proceedings.

334.     NAHS is a public school within the North Andover, Massachusetts Public School System. NAHS is supervised and funded by the Town of North Andover and Commonwealth of Massachusetts. NAHS has a duty to provide its students equal protection and due process of law by and through all procedures set forth.

335.     Plaintiffs were entitled to a process commensurate with the seriousness of the allegation – and, for Plaintiff Doe alone, potential discipline. Plaintiffs were deprived of a fundamentally fair process. Plaintiffs' rights were violated when:

    a.   Defendants failed to notify Plaintiff Doe directly that their conversation with her regarding her Title IX complaint against Tuttle also was being used to determine whether she was responsible for the alleged bullying charge,

    b.   Defendants failed to allow Plaintiff Doe to present witnesses, a defense, or a response to materials in conjunction with the bullying charge,

    c.   Defendants knew of Plaintiff Doe's report of sexual assault as early as May 2017 and, without contest, had received a formal report of sexual assault from Plaintiff Doe in October of 2017, and intentionally declined to investigate Plaintiff Doe's report until April of 2018, at which time, Defendants rushed to investigate both Plaintiff Doe's and Plaintiff Smith's complaints of sexual assault, resulting in demonstrably deficient and erroneous findings exonerating Tuttle for his actions.

    d.   Defendants failed to conduct thorough and fair investigations of Plaintiff Doe and Smith's allegations, without providing an impartial investigator or fact finder, without allowing Plaintiffs an advisor, and, in Plaintiff Doe's situation a guardian, and denied Plaintiffs the opportunity to respond to evidence and assertions contradicting their claims,

    e.   Defendants forced Plaintiff Smith to sign two safety plans without consulting a parent or guardian, or advisor, and

    f.   Defendants attempted to force Plaintiff Doe to sign a safety plan without consulting a parent or guardian or advisor, and the only reason Defendants did not was because Plaintiff Doe stopped attending NAHS.

336.    Defendants failed to provide Plaintiffs with basic due process protections afforded to all students at a public school, and, intentionally violated Plaintiffs' due process rights.

337.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and continue to suffer significant, severe, and ongoing emotional distress and mental anguish.

338.    As a direct and proximate result of Defendants, Plaintiffs suffered damages and injuries for which Defendants are liable.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process – Gender Discrimination)*

339.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

340.    Title IX prohibits federally funded institutions from engaging in discrimination on the basis of sex.

341.    Sexual harassment is included within the meaning of "discrimination" under Title IX.

342.    Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs.

343.    A single instance of rape is sufficiently severe to create a hostile education environment.

344.     Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendants may be held liable under Title IX.

345.     Defendants were aware of Plaintiff Doe's report of sexual assault as early as May 2017 and, without contest, had received a formal report of sexual assault from Plaintiff Doe in October of 2017.

346.     Defendants deliberately chose not to investigate Plaintiff Doe's report until April of 2018 at which time Defendants rushed to investigate both Plaintiff Doe's and Plaintiff Smith's complaints of sexual assault, resulting in demonstrably deficient and erroneous findings exonerating Tuttle for his actions.

347.     In response to Plaintiff Smith's report of sexual assault, Defendants' intentionally and willfully failed to perform any interviews or substantive investigation into Plaintiff Smith's report and unjustifiably found against Plaintiff Smith.

348.     Further, Defendants intentionally ignored and tacitly condoned further harassment and retaliation perpetrated against Plaintiffs by failing and/or refusing to investigate Plaintiffs' further complaints of harassment and retaliation against Tuttle and other members of the Defendants' community.

349.     Defendants' failure to properly investigate the assaults, conduct a timely and unbiased investigation and hearing or find Tuttle responsible for the assaults was intentional and unreasonable.

350.     Defendants' actions, and/or lack thereof, constitute "deliberate indifference" in violation of Title IX.

351.    Defendants' actions were taken to the detriment of Plaintiffs and to the benefit of Tuttle, the male perpetrator.

352.    Defendants' repeatedly showed favor to Tuttle, the male accused, to Plaintiffs', the females victims', detriment, including but not limited to forcing Plaintiffs' to unilaterally sign agreements limiting their free movement and enjoyment of school, failing to interpose any disciplinary actions against Tuttle for the further harassment of Plaintiffs, and strictly supervising Plaintiffs in an effort to discipline Plaintiffs for their alleged actions against Tuttle – i.e., their complaints of sexual assault against him.

353.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiffs' rapes and Defendants' actions /or inactions, Plaintiffs were subjected to a hostile education environment.

354.    As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs have suffered and continue to suffer significant, severe, and ongoing emotional distress and mental anguish.

355.    As a direct and proximate result of Defendants' actions /or inactions, Plaintiffs suffered damages and injuries for which Defendants are liable.

### AS AND FOR A FIFTH CAUSE OF ACTION
*(Breach of Contract)*
*(Against the Town Defendants)*

356.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

357.    Plaintiffs received copies of the Handbooks, which contain the Policies, upon enrollment at NAHS. Additionally, they received renewed handbooks upon each year of enrollment.

358.    At all relevant times hereto, a contractual relationship existed between the Town Defendants and Plaintiffs through the Handbooks, specifically those governing the Title IX investigatory procedure.

359.    Student handbooks are utilized as the "standard for interpreting contract claims." *Driscoll v. Bd. of Trustees of Milton Acad.,* 70 Mass. App. Ct. 285, 293, 873 N.E.2d 1177, 1185–86 (2007), *citing Schaer v. Brandeis Univ.,* 432 Mass. 474, 478-481, 735 N.E.2d 373 (2000).

360.    Through the documents the Town Defendants make available online and publish to their students, Defendants make express contractual commitments to students involved in such processes.

361.    In consideration for Plaintiffs' enrollment and acceptance of the terms of the Handbooks, which they assented to upon enrollment, Town Defendants assured Plaintiffs that it would comply with its policies and procedures articulated in the Handbooks, including in carrying out any disciplinary process with basic fairness.

362.    The contracts contain an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

363.    Based on the aforementioned facts and circumstances, the Town Defendants breached express and/or implied agreement(s) with the Plaintiffs, and the covenant of good faith and fair dealing contained therein.

364.    Additionally, while the Policies were wholly insufficient, the Town Defendants still did not even follow these inadequate Policies.

365.    Defendants committed several breaches of their agreements with Plaintiffs. A non-exhaustive list of Defendants' breaches includes the following:

### a. Failure to provide fundamental fairness.

366.     The Policies offer that "[f]airness in procedures will be observed both to safeguard the legitimate interests of the schools and to exhibit by appropriate example the basic objectives of a democratic society as set forth in the Constitutions of the United States and the State" and that "in disciplinary matters, teachers and administrators are fair and just."

367.     Notwithstanding, Town Defendants deprived Plaintiffs Doe and Smith of fundamental fairness in the investigatory process when they: (i) failed to thoroughly and impartially investigate the assaults of Plaintiffs Doe and Smith; (ii) did not provide Plaintiffs with an opportunity to confront and question their assailant; (iii) failed to inquire with Plaintiffs whether they would like to furnish any evidence or witnesses; (iv) failed to conduct *any* witness interviews; and (v) failed to conduct a separate interview of Plaintiff Doe for the alleged bullying complaint. All of which, would have undoubtedly resulted in a finding of responsibility for Tuttle.

### b. Violation of Confidentiality.

368.     The Policies affirm the students' rights of confidentiality, pursuant to 603 CMR 23.00.

369.     Notwithstanding, Town Defendants did *nothing* to ensure the confidentiality of the investigation and the atrocities that the Plaintiffs suffered.

370.     Plaintiffs confidentiality was violated on several occasions.

371.     More specifically, several additional and completely unnecessary individuals entered the room to hear Plaintiff Smith's account of the events that transpired.

372.     Additionally, Town Defendants again failed to take any action for Tuttle's repeated public statements and bravado surrounding the investigations and assaults. Alarmingly, Town Defendants did not enforce any confidentiality upon Tuttle.

373.    The foregoing constituted a clear violation of Plaintiffs' rights to confidentiality and privacy in the process.

### c. Failure to provide freedom from harassment.

374.    The Policies provide students with "the right to be free from any type of harassment by other students while…on school grounds, School District property, or property within the jurisdiction of the School District, school buses, or attending or engaging in school activities."

375.    Town Defendants breached this policy by not providing a safe environment free from harassment for Plaintiffs Doe and Smith to receive their education.

376.    Notwithstanding, the Plaintiffs suffered harassment when they were assaulted, and later when they were subjected to ridicule and name calling as a result of their accusations.

377.    Astoundingly, the Defendants failed to take any action to stop the harassment, despite full knowledge of the harassment.

378.    The Plaintiffs were left with their emotional scars and became the subjects of ridicule, without any assistance from the Town Defendants to protect them.

### d. Failure to conduct the investigation in a timely manner.

379.    The Policies provide that "[a]llegations of harassment will be promptly and reasonably investigated."

380.    Pursuant to the Policies, upon receipt of an allegation, the principal is required to investigate the allegations, interview the complainant, and respond in writing within ten (10) school days. Should the matter remain unresolved, a complainant can appeal in writing to the Title IX Coordinator.

381.    Defendants breached this when they failed to investigate Plaintiff Doe's claim of the October 2017 assault until February 2018 and then did not interview her until April 2018.

382.    Plaintiff Doe unnecessarily waited *sixth months* to have the opportunity to share her traumatic account of the assault that occurred.

383.    In fact, Plaintiff Doe was only interviewed after Mother Doe's insistence.

*e. Failure to provide freedom from retaliation.*

384.    The Policies provide that retaliation against a student that filed a complaint of harassment, or anyone who participated or aided in the investigation, is strictly prohibited by the Policies.

385.    Town Defendants breached this policy by not providing a safe environment free from retaliation for Plaintiffs Doe and Smith to receive their education.

386.    Notwithstanding, the Plaintiffs suffered retaliation when they were subjected to ridicule and name calling as a result of their accusations, as well as Tuttle's – their assailant – persistent and open taunting. Plaintiff Doe suffered when an agent of the Defendants told her to never come to a school event again. Plaintiff Smith suffered retaliation when she was threatened to go back to the day school, with her assailant, if she did not behave in night school.

387.    Astoundingly, the Defendants failed to take any action to stop the retaliation, despite full knowledge of the harassment.

388.    The foregoing violations, individually and in the aggregate, resulted in a process that contributed to the erroneous finding of non-responsibility.

389.    As a direct and proximate result of the above conduct, Plaintiffs have sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational opportunity, reputational damages, and other direct and consequential damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
*(Denial of Basic Fairness)*
*(Against the Town Defendants)*

390.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

391.    Massachusetts courts have held that "[s]chool disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (citing *Coveney v. President & Trustees of Holy Cross College*, 445 N.E.2d 136, 139 (1983); *Schaer,* 735 N.E.2d at 380 (2000). See *Driscoll,* 70 Mass. App. Ct. at 293 (extending *Schaer's* holding that a school handbook sets forth the terms of a contract claim).

392.    The Policies offer that "[f]airness in procedures will be observed both to safeguard the legitimate interests of the schools and to exhibit by appropriate example the basic objectives of a democratic society as set forth in the Constitutions of the United States and the State" and that "in disciplinary matters, teachers and administrators are fair and just."

393.    Thus, Town Defendants had a duty, either under an express or implied contract as a matter of common law, to ensure that the proceedings were conducted in good faith with basic fairness.

394.    Notwithstanding, Town Defendants deprived Plaintiffs Doe and Smith failed to afford basic fairness in the investigatory process when they: (i) failed to thoroughly and impartially investigate the assaults of Plaintiffs Doe and Smith; (ii) did not provide Plaintiffs with an opportunity to confront and question their assailant; (iii) failed to inquire with Plaintiffs whether they would like to furnish any evidence or witnesses; (iv) failed to conduct *any* witness interviews; (v) failed to conduct a separate interview of Plaintiff Doe for the alleged bullying complaint; and

(vi) failed to properly utilize the preponderance of the evidence standard, required by Title IX, which would have undoubtedly resulted in a finding of responsibility for Tuttle.

395.    As a direct and proximate result of the above conduct, Plaintiffs have sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational opportunity, reputational damages, and other direct and consequential damages.

### AS AND FOR A SEVENTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress against the Town Defendants and the Individual Defendants in their individual and officially capacities)*

396.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

397.    To recover for intentional infliction of emotional distress in Massachusetts, it must be demonstrated that: (i) "defendant intended, knew, or should have known that his conduct would" result in or "cause emotional distress"; (ii) defendant's conduct rose to the level of extreme and outrageous; (iii) defendant's conduct did indeed cause emotional distress; and (iv) the emotional distress rose to the level of severe. *Narragansett Bay Ins. Co. v. Kaplan*, 146 F. Supp. 3d 364, 371 (D. Mass. 2015).

398.    Defendants knew that forcing Plaintiffs to attend school with their assailant, as detailed *supra*, as a result of their erroneous finding that Tuttle was not responsible, after they bravely came forward with their complaints that they suffered assaults, would result in severe emotional distress.

399.    Defendants also knew that subjecting Plaintiff Smith to *two* safety plans, as well as threatening her that she would need to go back to day school with her assailant, would certainly cause her to suffer emotional distress.

400.     Additionally, Defendants knew that the manner in which they conducted these sham investigations would result in emotional distress. Defendants willingly did not seek to determine the truth of what occurred – namely, that Tuttle sexually assaulted Plaintiffs Doe and Smith.

401.     The utter lack of regard for procedure and process in the manner in which the Defendants conducted the investigation rose to the level of extreme and outrageous, discussed *supra*.

402.     Due to being forced to attend school with their assailant, as well as the retaliatory remarks and utter disbelief and trust in the Defendants, the Defendants caused Plaintiffs severe emotional distress.

403.     As a result, Plaintiffs Doe and Smith suffered severe emotional distress. Both were forced to move educational environments in some manner: Plaintiff Doe to a substandard educational environment and Plaintiff Smith to the Scarlett Knight Academy aka Night School.

404.     Plaintiffs suffered severe emotional distress as a result of actions and procedures employed by defendants throughout the investigation and lack of action as a result said investigation. Both Plaintiffs Doe and Smith receive ongoing therapy as a result of the excruciating trauma endured.

405.     Additionally, Plaintiff Doe suffered suicidal machinations and thoughts as a result, and even was hospitalized for a period of time.

406.     Plaintiffs were robbed of a typical high school experience, for which they suffered severe emotional distress.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

*(Negligence against the Town Defendants and the Individual Defendants in their individual and officially capacities)*

407.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

408.    To recover for negligence in Massachusetts, it must be demonstrated that: (i) defendants owed a legal duty; (ii) defendants breached that duty; (ii) the breach is the proximate caused the injury or damage; and (iv) plaintiff actually experienced damage or injury. *Hayes v. Mirick,* 378 F. Supp. 3d 109, 115 (D. Mass. 2019).

409.    Defendants owed a duty to Plaintiffs provide them with a reasonably safe educational environment free from harassment, including, but not limited to, "verbal harassment or abuse, pressure for sexual activity, repeated remarks to a person with sexual or demeaning implications, unwelcomed touching, suggesting or demanding sexual involvement accompanied by implied or explicit threats…display of sexually suggestive objects or pictures" within the physical parameters outlined in the Handbooks.

410.    Defendants breached this duty when Plaintiffs suffered sexual assault and harassment, which the Town Defendants repeatedly declined to take action to stop.

411.    Additionally, Defendants also owed a duty to Plaintiffs to provide a reasonably safe educational environment free from retaliation within the parameters outlined in the Handbooks and protect Plaintiffs Doe and Smith accordingly.

412.    More specifically, Plaintiffs suffered retaliation in several manners: (i) by Tuttle, their assailant, repeatedly after their respective assaults, in the hallways of NAHS; (ii) when Plaintiff Doe was called "whore" and slut", among other names, by fellow NAHS students, within full earshot of NAHS employees; (iii) when Plaintiff Doe suffered ostracization at school related

events such as sports matches and was told to avoid all school events; (iv) when Defendants' agents belittled Plaintiffs as rape victims; (v) when Plaintiff Doe was forced to attend a substandard school as a result of the retaliation against her; (vi) when Plaintiff Smith was forced to enroll in Scarlett Knight Academy to be free from retaliation; (vii) when agents of the Defendants threatened Plaintiff Smith that she would be kicked out of the Academy and be forced to attend day school with her assailant, Tuttle.

413.    Defendants breached this duty when they failed to take action to provide a reasonably safe educational environment free from retaliation and harassment, and protect Plaintiffs Doe and Smith accordingly.

414.    Specifically, the Town Defendants did not take any action *at all* to rectify any of the retaliation or harassment suffered by Plaintiffs.

415.    Moreover, in conducting its investigation of Plaintiffs complaints against Tuttle, the Town Defendants owed Plaintiff a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying the Handbooks' outlines policies and procedures, and appreciating the severity of the impact of the charges and potential consequences.

416.    Through the acts set forth above, the Town Defendants breached their duty by carelessly, improperly, and negligently performing its investigation that violated the rights and interests of the Plaintiffs.

417.    Specifically, the Town Defendants have negligently trained and supervised the individuals that serve as investigators in Title IX investigations, making them unfit to serve in these critical roles.

418.    Evidence of the negligent training became apparent through the following actions and instances:

a.  Failure to fully investigate the assaults of Plaintiffs Doe and Smith;

b.  Failure to seek witnesses from Plaintiffs to corroborate their narratives;

c.  Failure to conduct *any* witness interviews;

d.  Failure to conduct a separate interview of Plaintiff Smith, at all;

e.  Failure to conduct a separate interview of Plaintiff Doe for the alleged bullying complaint;

f.  Failure to afford a conduct hearing;

g.  Failure to allow complainants (here, the Plaintiffs) to directly question their assailant (here, Tuttle);

h.  Failure to properly utilize the preponderance of the evidence standard, which would have surely resulted in a finding of responsibility for Tuttle;

i.  Failure to take any action in response to a clear violations of confidentiality in the process, including, but not limited to, when several additional individuals entered the room to hear Plaintiff's Smith account of her assault and Tuttle's repeated public statements and bravado regarding the investigations.

419.   A non-negligent educational institution conducting a Title IX disciplinary proceeding would have ensured that its personnel were thoroughly familiar with proper procedure and capable of carrying the aforementioned procedures out in a fair and impartial manner to ensure a correct outcome.

420.   As a direct and proximate result of the above conduct, Plaintiffs have sustained tremendous damages, including, without limitation, emotional and psychological distress (including hospitalizations), loss of educational opportunity, and other career opportunities, past

and future economic injuries, reputational damages, and other direct and consequential damages that were foreseeable.

421.    Accordingly, the Defendants are liable to Plaintiffs for negligence and for all damages arising therefrom.

## AS AND FOR A NINTH CAUSE OF ACTION

*(Negligent Infliction of Emotional Distress against the Town Defendants and the Individual Defendants in their individual and officially capacities)*

422.    Plaintiffs repeat and re-allege each and every allegation above with the same force and effect as if fully set forth herein.

423.    To recover for negligent infliction of emotional distress in Massachusetts, a plaintiff must demonstrate: (i) that the defendant was negligent, (ii) "emotional distress"; (iii) causation; (iv) "physical harm manifested by objective symptomatology"; and (v) "that a reasonable person would have suffered emotional distress under the circumstances of the case." *Doe v. Amherst Coll.,* 238 F. Supp. 3d 195, 228–29 (D. Mass. 2017) (internal citations omitted).

424.    Defendants were negligent, as set forth in the eighth cause of action, *supra.*

425.    Plaintiffs suffered emotional distress as a result of actions and procedures employed by Defendants. Plaintiffs Doe and Smith both suffer severe emotional and psychological distress as a result. Plaintiff Doe's distress is so severe that it resulted in her hospitalization due to a suicidal nature. Both Plaintiffs Doe and Smith receive ongoing therapy as a result of the excruciating trauma endured.

426.    Both Plaintiffs Doe and Smith found it hard to manage to get through their daily lives. They are both fatigued with anxiety, depression, and lack of sleep, due to their utter lack of faith and trust in the Defendants.

427.   A reasonable person would have suffered emotional distress under the circumstances. Specifically, after being assaulted, the Defendants conducted sham investigations of Plaintiffs' assaults and absurdly found their assailant not responsible, despite the Plaintiffs' clear demonstration to the contrary. The Defendants forced the Plaintiffs to enter an environment daily with their assailant, where they were ridiculed and retaliated against. A reasonable person, when looking at the totality of circumstances, would determine that Plaintiffs suffered emotional distress.

## DEMAND FOR A JURY TRIAL

Pursuant to FRCP 38(b), Plaintiff hereby demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiffs seeks a judgment against Defendants as follows:

(i)     An Order enjoining Defendants, along with their agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    Injunctive relief required by the District Defendants to redress its violations of Title IX, including: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; and (3) providing for annual, independent review by outside reviewers of Defendants' compliance with sexual harassment policies and Title IX guidance;

(iii)    An award of damages against Defendants on Plaintiffs' claims asserted in this amended complaint, as outlined above, including, without limitation, reimbursement of and prepayment for all of Plaintiffs' tuition, school, or related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assaults; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendants; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iv)    Punitive and/or exemplary damages against Defendants;

(v)    Statutory pre- and post-judgment interest on all sums awarded;

(vi)    An award of costs and attorneys' fees; and

(vii)    Any other relief the Court finds just and proper.

Dated: Boston, Massachusetts
       June 25, 2020

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiffs Mother Doe, as parent and natural guardian for Jane Doe, a minor, and Jane Smith***

**By: /s/ *Regina M. Federico***
**Andrew T. Miltenberg (*pro hac vice*)**
**Gabrielle M. Vinci (*pro hac vice*)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**gvinci@nmllplaw.com**

**Regina M. Federico (BBO #700099)**
**101 Federal Street, Nineteenth Floor**

**Boston, Massachusetts 02110**
**(617) 209-2127**
**rfederico@nmllplaw.com**

### CERTIFICATE OF SERVICE

    I, Regina M. Federico, hereby certify that on this 25th day of June, 2020, a true copy of the foregoing was filed through the ECF system, which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be served upon anyone indicated as a non-registered participant.

*/s/ Regina M. Federico*
**Regina M. Federico, Esq.**