UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MOTHER DOE, as parent and natural guardian for JANE DOE, a minor, and JANE SMITH, | * <br> * <br> * <br> * |
| Plaintiffs, | * |
| v. | *    Civil Action No. 1:20-cv-10310-IT |
| | * |
| TOWN OF NORTH ANDOVER; NORTH ANDOVER SCHOOL DISTRICT; NORTH ANDOVER SCHOOL COMMITTEE; CHET JACKSON, in his official and individual capacity; SCOTT YOUNG, in his official and individual capacity; and BROOKE RANDALL, in her official and individual capacity, | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * |
| Defendants. | * |

MEMORANDUM & ORDER

May 16, 2023

TALWANI, D.J.

Plaintiffs, proceeding as Jane Smith and Mother Doe, are respectively a former student at

North Andover High School ("NAHS") and the parent and natural guardian of another former

NAHS student (referred to here as Jane Doe). They bring this action against Defendants Town of

North Andover ("Town"), North Andover School District ("School District") Assistant

Superintendent Gregg Gilligan, NAHS Principal Chet Jackson, NAHS Assistant Principal Scott

Young, and NAHS Assistant Principal Brooke Randall.[1] Plaintiffs assert violations of Title IX of

---

[1] Gilligan, Jackson, Young and Randall (collectively, the "Individual Defendants") are sued in
their official and individual capacities. Plaintiffs also named the School District and North
Andover School Committee ("School Committee") but do not dispute Defendants' assertion that
the School District and School Committee "do not have a legal identity that is separate and

the Education Amendments of 1972 ("Title IX") and 42 U.S.C. § 1983, as well as claims for

breach of contract, denial of basic fairness, intentional infliction of emotional distress,

negligence, and negligent infliction of emotional distress. Defendants move for summary

judgment of Smith's claims, and partial summary judgment of Doe's claims. See Defs' Mot.

[Doc. No. 54].

## I.    Factual Background

The following facts are drawn from the summary judgment record and are construed in

the light most favorable to Plaintiffs.

NAHS is a public high school in the School District located in North Andover,

Massachusetts. See Defs' Ex. R (NAHS Handbook) [Doc. No. 55-19].

### A.    *Events During the 2016-2017 School Year*

Jane Doe ("Doe") began attending NAHS as a freshman in Fall 2016. Pls' Stmt. of

Material Facts in Dispute ("Pls' Stmt") ¶ 7 (undisputed) [Doc. No. 64]. In April 2017, Doe was

sexually assaulted off campus by NAHS student Eli Tuttle, then a sophomore. Doe Dep. Tr.

79:11-21 [Doc. No. 63-3]; Answer ¶ 60 [Doc. No. 31]. According to Doe, Tuttle pinned Doe to

the ground and digitally penetrated Doe without her consent. Am. Compl. ¶¶ 64-65 [Doc. No.

30]. Doe told Mother Doe about the assault soon after it occurred but did not want to report it

and Mother Doe acceded to her request. Mother Doe Dep. Tr 108:21-109:14 [Doc. No. 63-4].

In May 2017, Doe's guidance counselor Kaitlin Rogato reported to Doe's mother that

Doe had written an essay entitled "This I Believe" that discussed Doe being the victim of sexual

assault. Id. at 109:15-110:21; Pls' Ex. Y (Doe Essay) [Doc. No. 63-27]. Doe's mother then

_____

distinct from the Town of North Andover." See Defs' Mem. 2, n.2 [Doc. No. 56]; November 9,
2022 Hearing Transcript 3:23-4:8 [Doc. No. 80].

informed the guidance counselor of the April assault. Mother Doe Tr. 110:7-21 [Doc. No. 63-4].

Although guidance counselors are mandatory reporters, see Defs' Ex. B (Defs' Answer to

Interrogatories) (listing mandatory reporting trainings) [Doc. No. 55-2]; Defs' Ex. D (DCF

Report listing Polanco as a mandatory reporter) [Doc. No. 55-5], it is unclear from the record if

the guidance counselor or any other school official took any action, Mother Doe Dep. Tr. 111:2-

18 [Doc. No. 63-4].

     B.     *Events During the 2017-2018 School Year*

     On or about October 18, 2017, when Doe was a sophomore and Tuttle was a junior,

Tuttle sexually assaulted Doe for the second time by pinning her to the ground and raping her.

Am. Compl. ¶¶ 93-97 [Doc. No. 30]; see Pls' Ex. M (October 19, 2017 Police Report) [Doc. No.

53-15]. Like the assault during her freshman year, the October assault took place off-campus and

after school hours. Pls' Ex. M (October 19, 2017 Police Report) [Doc. No. 53-15]. On October

19, 2017, Doe reported the second assault to high school adjustment counselor Alison Polanco,[2]

who then contacted guidance counselor Rogato. Polanco Dep. Tr 33:9-35:15 [Doc. No. 63-10].

Polanco and Rogato filed a report with the Department of Children and Families, and Rogato

contacted the North Andover Police Department, and an officer took a report of both assaults. Id.

at 35:19-36:17. During the investigation, Tuttle admitted to having sexual intercourse with Doe,

claiming that Doe "'kind of made me put it in.'" Pls' Ex. M, 7 (October 20, 2017 Police Report)

[Doc. No. 63-15] (quoting Tuttle's statement to police).

     On November 20, 2017, Tuttle's mother complained to the North Andover Police

Department that she believed Doe had engaged in bullying by making a false accusation of

_____

[2] At the time of the assault, Polanco's last name was Colarusso.

sexual assault, spreading rumors and generally engaging in a campaign to social exclude Tuttle by making these false statements. Id. at 9. Tuttle's parents again contacted the North Andover Police Department on December 16, 2017, complaining that Doe was bullying Tuttle by telling people that Tuttle had raped her and by attending NAHS wrestling matches. Id. at 11. A few days later on December 18, 2017, an officer from the North Andover Police Department met with Doe and Guidance Counselor Rogato and told Doe "about the importance of not putting herself in the position to be around [Tuttle] or his parents." Id.

Shortly thereafter, Doe's mother complained to NAHS officials that her daughter was being told to refrain from attending school activities where Tuttle was present and asked NAHS officials for an investigation into the assault and events thereafter. Pls' Ex. FF, 3 [Doc. No. 63-34]; Young Dep. Tr. 47:19-48:6 [Doc. No. 63-13]. The North Andover Police Department officer subsequently spoke with Doe's mother about the previous conversation with Doe, and again encouraged Doe to avoid situations, including school events, where Tuttle would be present. Pls' Ex. M, 11 (October 20, 2017 Police Report) [Doc. No. 63-15]. NAHS officials did not take any steps to initiate a Title IX investigation into Doe's alleged assault at that time. Randall stated that she did not believe she had any obligations to investigate because the assault did not occur on school grounds and the police were conducting an investigation. Randall Dep. Tr. 32:2-24 [Doc. No. 63-11]. Young testified that he initially thought that the school was only meant to refer students to the police. Young Dep. Tr. 48:17-49:5 [Doc. No. 63-13].

On February 2, 2018, a second NAHS student reported a January 6, 2018 off-campus assault by Tuttle. Pls' Ex. X (Sankey Report) [Doc. No. 63-26].[3] NAHS administrations reported

---

[3] The Sankey Report was issued by outside attorney Jeff Sankey on April 23, 2019, more than a year after this incident. Sankey was retained by the North Andover Public Schools to assess the

the allegations to the North Andover Police Department and the Department of Children and Families. Id.

Also in early February 2018, Doe's mother emailed NAHS administrators asking again about a Title IX investigation. Randall Dep. Tr. 83:3-21 [Doc. No. 63-11]. NAHS officials then began to inquire as to whether they should have investigated Doe's report of sexual assault. Id. The District's Title IX Coordinator informed Young that he did in fact need to investigate, and that they "should have started investigations earlier." Young Dep. Tr. 48:7-49:22 [Doc. No. 63-13]. On or about February 7, 2018, Young asked Doe's mother for her permission to begin the investigation. Am. Compl. ¶ 142 [Doc. No. 30]; see Randall Dep. Tr. 82:13-83:2 [Doc. No. 63-11].[4] Also in February 2018, NAHS conducted a Title IX investigation concerning the report by the second NAHS student. Pls' Ex. X, 2-3 (Sankey Report) [Doc. No. 63-26].

Young and Randall led the investigation as to Doe's assault, and Jackson was not involved. Young Dep. Tr. 90:11-16, 94:19-25. Prior to this investigation, neither Randall nor Young had conducted a Title IX investigation at NAHS. Id. at 124:19-23; Randall Dep. Tr. 115:24-116:18 [Doc. No. 63-11]. The record does not reflect who conducted the investigation as to the alleged assault of the unnamed student.

Randall interviewed Tuttle on February 13, 2018, about both Doe's Title IX complaint and Tuttle's bullying complaints, with Tuttle's mother and Young present. Pls' Ex. BB [Doc.

---

"District policies, procedures, and forms relating to reports of student criminal activity and /or harassment, the processing and investigation of such reports, and ensuring a safe and non-hostile environment for all students," Defs' Ex. O, 3 (Sankey Retention Letter) [Doc. No. 55-16], and to assess the implementation of the policies regarding the allegations by Doe, Smith, and an unnamed student, Pls' Ex. X, 2 (Sankey Report) [Doc. No. 63-26], after Tuttle was arrested on felony charges in New Hampshire in March 2019, as discussed further below.

[4] Doe's mother did not return the signed consent form until March 2, 2018, Young Dep. Tr. 131:8-25 [Doc. No. 63-13], but the investigation proceeded nonetheless.

No. 63-30]. Young also interviewed one other person named "Dan." Young Dep. Tr. 163:19-22 [Doc. No. 63-13]. The investigation concerning the complaint by the second student concluded that the alleged assault could not be proven by a preponderance of the evidence, and on February 15, 2018, both Tuttle and that student signed Safety Plans requiring them to refrain from any avoidable contact or communication with each other. Pls' Ex. X, 3 (Sankey Report) [Doc. No. 63-26].

On or about March 2018, Doe transferred out of NAHS and began attending SEEM Collaborative, an education program in Stoneham, Massachusetts. Pls' Stmt. ¶ 7 (undisputed) [Doc. No. 64].

Jane Smith was a junior during this school year. Id. at ¶ 3 (Smith began attending NAHS as a freshman in the Fall 2015). On April 2, 2018, Smith was sexually assaulted by Tuttle off campus and after hours. Pls' Ex. N (April 3, 2018 Police Report) [Doc. No. 63-16]. That evening, Smith emailed NAHS counselor Polanco asking for a meeting. Defs' Ex. C (April 2, 2018 Email) [Doc. No. 55-4]. On April 3, 2018, Smith met with Polanco and Sarah Hickey and told them about the assault. Polanco Dep. Tr. 52:23-54:11 [Doc. No. 63-10]. Polanco then submitted a mandatory report to the Department of Children and Families. Defs' Ex. D (DCF Report) [Doc. No. 55-5].

Polanco and Hickey contacted the school resource officer, North Andover Police Department Officer William Enright, who told them to contact the sexual assault officer. Polanco Dep. Tr. 56:9-19; 57:13-23 [Doc. No. 63-10]. Polanco informed Randall about Smith's allegations of assault. Id. at 58:14-19; Randall Dep. 141:6-142:3 [Doc. No. 55-21]. Smith told Randall that she had been assaulted, but that she did not go into detail. Smith Dep. Tr. 89:1-14 [Doc. No. 55-20].

After meeting with Smith, Randall called Smith's grandmother and asked her to come to the school, and also contacted the North Andover Police Department. Randall Dep. Tr. 150:6-151:15, 152:2-24 [Doc. No. 55-21]. Smith, Smith's grandmother, Randall, Polanco, and several North Andover Police Department detectives then met at the school to make a formal complaint. Grandmother Smith Dep. Tr. 40:22-41:10 [Doc. No. 63-6]. Tuttle was arrested that night for Indecent Assault and Battery of a minor over age 14. Defs' Ex. E. (April 3, 2018 Police Report) [Doc. No. 55-6]. NAHS Principal Jackson was never informed by either the District Attorney or the police that Tuttle had been charged with a felony, and Jackson believed he could not expel or initiate a long-term suspension on a student unless Tuttle was charged with a felony. Defs' Ex. Y (Jackson Aff.) ¶¶ 4-5 [Doc. No. 55-26]. Soon after Smith made her complaint, Tuttle was removed from the two classes he shared with Smith. Smith Dep. Tr. 128:20-129:4 [Doc. No. 55-20]; Randall Dep. Tr. 177:13-24 [Doc. No. 55-21].

In an April 3, 2018 interview, Randall asked Doe (who was no longer a student at NAHS) about "[Doe's] side of the story." Randall Dep. Tr. 130:2-132:2 [Doc. No. 63-11]. Doe was not told about Tuttle's bullying complaint nor asked about it. Young Dep. Tr. 109:15-23 [Doc. No. 63-13].

On April 4, 2018, Randall, with assistance from the School District's outside counsel, began a Title IX investigation into Tuttle's assault of Smith. Randall Dep. Tr. 159:20-160:16, 161:4-7 [Doc. No. 55-21]. As part of the investigation, Randall set up a meeting with Tuttle and his mother for April 4, 2018. Id. at 161:12-162:25, 164:18-23 (identifying the planned date for the interview). However, on advice of his counsel, Tuttle did not answer any questions and was not interviewed. Id. at 163:17-164:3. Randall did not schedule any additional meetings with Tuttle. Id. at 166:11-25 [Doc. No. 63-11]. On April 11, 2018, Randall met with Smith to ask

follow-questions from the initial meeting on April 3, 2018.  Id. at 170:2-17 [Doc. No. 55-21].

Randall did not write down questions in advance of the meeting. Id. at 171:4-22. At that meeting,

Randall asked Smith if she had any further contact with Tuttle since the initial report, and if any

harassing behavior or communications occurred. Id. at 173:17-174:5. Smith reported she had

"crossed paths" with Tuttle, but they did not have any direct contact other than Tuttle looking at

her. Id. at 174:6-15. At one meeting, where Smith and Randall were discussing alternative

schooling for Tuttle, Office Enright asserted Tuttle's right to an education too. See Smith Dep.

Tr. 101:13-23 [Doc. No. 63-5].

On April 13, 2018, NAHS officials Young and Randall notified Doe's parents of the

result of the Title IX investigation and the bullying investigation, which were conducted

concurrently. Young Dep. Tr. 128:5-14 [Doc. No. 63-13]; Pls' Ex. P (Doe Title IX Outcome

Letter) [Doc. No. 63-18]; Pls' Ex. Q (Doe Bullying Outcome Letter) [Doc. No. 63-19]. The Title

IX Outcome letter stated that the investigation was "initially delayed pending completion of the

initial criminal investigation," Pls' Ex. P (Doe Title IX Outcome Letter) [Doc. No. 63-18], but

did not state when that criminal investigation was concluded. The Title IX investigation found

that Tuttle had reported that the sexual activity was consensual, while Doe had reported that it

was a criminal assault, and that NAHS was notified that no criminal charges had been brought

against Tuttle. Id. at 4. The report noted further that the investigation had "revealed no

subsequent instances of inappropriate comments, physical acts or gestures directed at [Doe],"

and that "NAHS has been unable to substantiate, by a preponderance of evidence, that [Tuttle]

engaged in sexual harassment of [Doe] in violation of Title IX, M.G.L. c. 76, § 51 and/or the

policies of the North Andover Public Schools." Id. The investigation found that while NAHS

was unable to support a determination of sexual harassment or assault, the allegations and

investigation "resulted in an environment for both [Doe] and [Tuttle] that is not ideal for learning," and listed various supports that NAHS planned to put in place. Id. at 4-5.

Regarding Tuttle's bullying complaint against Doe, NAHS found that "the collective incidents investigated do not meet the definition of bullying…[and] the investigation of [Tuttle's] allegations failed to produce a preponderance of evidence to establish that [Doe] repeatedly directed written, verbal or electronic expressions or physical acts or gestures at [Tuttle]" that would constitute bullying under Massachusetts law and District Policy. Pls' Ex. Q (Doe Bullying Outcome Letter) [Doc. No. 63-19]. Notably, the letter stated that Doe's social media statements, if repeated, could support a finding of bullying. Id

As to Smith, Randall notified Smith's grandmother of the Title IX investigation outcome, also on April 13, 2018. Pls' Ex. R (Smith Title IX Outcome Letter) [Doc. No. 63-20]. The investigation found that "there is not a preponderance of evidence to contradict [Smith]'s claims of inappropriate sexual conduct by [Tuttle]…however, there is also no evidence to support that [Tuttle] engaged in inappropriate communications or conduct toward [Smith] either prior or subsequent to that reported incident." Id. at 2. The investigation found that NAHS was unable to support a determination of sexual harassment or assault. However, the letter listed four actions the school would take "to help ensure a non-hostile environment," including the Safety Plan described below. Id. The letter stated the policy on retaliation, and asked Smith and her grandmother to report any such retaliatory action immediately. Id.

On April 13, 2018, Smith and Tuttle entered into "School Safety Plans." Defs' Ex. F (Tuttle Safety Plan) [Doc. No. 55-7]; Ex. G (Smith Safety Plan) [Doc. No. 55-8]. Smith's plan required her to "refrain from any avoidable contact or communication" with Tuttle, "travel her normal pattern in order to attend any classes," and report any contact to the school. Defs' Ex. G

(Smith Safety Plan) [Doc. No. 55-8]. Smith felt that she did not have a choice but to sign it and signed the plan without her guardian present. Smith Dep. Tr. 126:14-21 [Doc. No. 55-20]. Tuttle's safety plan [Doc. No. 55-7] contains the same language. The safety plans had been used at NAHS before, and no changes were made to the templates other than adding the students' names. Randall Dep. Tr. 200:5-201:3 [Doc. No. 55-21].

On May 1, 2018, Smith obtained a Harassment Prevention Order against Tuttle. Defs' Ex. K [Doc. No. 55-12].

Although Smith, Randall, and Polanco testified that the purpose of the safety plan was to keep Smith and Tuttle apart, see Randall Dep. Tr. 202:5-23 [Doc. No. 55-21]; Polanco Dep. Tr. 79:17-20 [Doc. No. 55-22]; Smith Dep. Tr. 102:11-20 [Doc. No. 55-20], Smith stated that several incidents occurred after the safety plans were in effect, and she was reprimanded at least once for making a complaint, Smith Dep. Tr. 141:1-14 [Doc. No. 63-5]. On one occasion, Tuttle and two girls stared and talked about Smith, who then reported it to Randall, but "nothing was ever done about it." Id. at 141:15-142:24. During the 2017 and 2018 school year, Randall received eight to ten reports regarding interactions between Smith and Tuttle. Randall Dep. Tr. 211:5-15 [Doc. No. 63-11]. These included: an incident on April 24, 2018, where Tuttle and Smith made eye contact while talking into school, id. at 211:16-212:10, 212:21-213:3 [Doc. No. 63-11]; an interaction where Tuttle saw Smith by the gym steps during passing time, where Randall concluded there was no violation, id. at 217:9-24; an interaction between Smith and Tuttle on June 8, 2018, in the lunchroom outside the cafeteria, id. at 224:23-225:9; and an interaction on June 21, 2018, where Tuttle was talking about his court case; id. at 232:18-233:16. Randall testified that she received no reports of direct contact between Tuttle and Smith between April 2018 and June 2018. Id. at 233:17-25. Smith also sent two emails to Randall regarding

incidents on June 1, 2018, where Tuttle gave Smith a "very intimidating look" at school, see Pls's Ex. S [Doc. No. 63-21], and June 11, 2018, where Tuttle was in Smith's classroom in violation of the restraining order, see Pls' Ex. T [Doc. No. 63-22]; Defs' Ex. L (June 12, 2018 Police Report) [Doc. No. 55-13]. Officer Enright and Randall investigated that incident. Id. Hickey and Polanco continued to check in with Smith for the remainder of the school year. Smith Dep. Tr. 132:3-8 [Doc. No. 55-20].

C.      *Events During the 2018-2019 School Year*

At the beginning of the 2018 school year, Randall discussed the Safety Plan with Smith and Tuttle. Randall Dep. Tr. 234:11-235:24 [Doc. No. 55-21]. Because the Safety Plan required Smith and Tuttle to stay apart but they were assigned the same lunch period, Smith often ate lunch in a different room. Id. at 238:23-239:14; Smith Dep. Tr. 110:17-111:14 [Doc. No. 63-5]. Although Smith brought this issue to Randall's attention, no changes to the schedules were made. Randall Dep. Tr. 239:8-14 [Doc. No. 55-21]. Despite the ongoing[5] criminal case, Randall told Smith that Randall could not remove Tuttle from the school because there was no criminal prosecution. Pls' Stmt. ¶ 38 (undisputed) [Doc. No. 64]. On or about September 17, 2018, Tuttle reported to Randall that Smith was in his class in violation of the safety plan, and Randall gave Smith a warning. Randall Dep. Tr. 242:20-243:16 [Doc. No. 63-11]. On or about November 2, 2018, Tuttle reported to Randall that Smith was at the steps between the cafeteria and the gym.

---

[5] Although the parties state that the Essex County District Attorney decided not to charge Tuttle following his arrest for Indecent Assault and Battery on April 3, 2018, Pls' Stmt. ¶¶ 21-22 (undisputed that the District Attorney decided not to criminally charge Tuttle) [Doc. No. 64], it appears based on a letter from the District Attorney, Defs' Ex. M [Doc. No. 55-14], that charges were still pending at the beginning of the 2018-2019 school year.

Id. at 244:9-246:10. However, upon investigation, Randall found no violation and Smith was not disciplined. Id.

In December 2018, Smith transferred to the NAHS evening school, Scarlet Knight Academy ("SKA"). Pls' Stmt. ¶ 40 [Doc. No. 64]. Upon enrollment, Smith entered into a Safety Plan for her attendance at SKA. Pls' Ex. U (SKA Safety Plan) [Doc. No. 63-23]. The plan restricted travel on Main Street of NAHS and in the gymnasium area. Id. At one point while attending SKA, Hickey encouraged Smith to avoid basketball games at the school to avoid Tuttle, even though he was only on the wrestling team, not the basketball team. Smith Dep. Tr. 108:4-109:15 [Doc. No. 63-5]. In addition, Officer Enright would follow Smith as she traveled around SKA. Id. at 117:17-118:14. At one point, Smith violated the Safety Plan and was denied the right to an "open campus" for one week. Pls' Stmt. ¶ 44 (undisputed) [Doc. No. 64].

On December 10, 2018, the Essex County District Attorney's Office informed Smith's grandmother that after a hearing on November 26, 2018, the criminal charges against Tuttle were Continued Without A Finding until Tuttle turned 19, and that he was placed on probation with conditions. Defs' Ex. M [Doc. No. 55-14].

On March 12, 2019, after new felony charges were brought against Tuttle by the State of New Hampshire, NAHS formally placed Tuttle on a long-term suspension. See Defs' Ex. N [Doc. No. 55-15]. On March 19, 2019, Smith's attorney emailed Jackson requesting NAHS rescind Smith's safety plan, as Tuttle was no longer attending the school. Pls' Ex. V [Doc. No. 63-24]. Smith's SKA Safety Plan ended shortly thereafter, Gilligan Dep. Tr. 115:1-10 [Doc. No. 63-7], but Smith was not immediately told that the Safety Plan was no longer in effect, Smith Dep. Tr. 125:8-22 [Doc. No. 63-5]. Smith graduated from SKA in June 2019. Grandmother Smith Dep. Tr. 86:14-16 [Doc. No. 55-25].

D.      *Defendants' Sexual Misconduct and Training Policies*

During the period relevant to this matter, the School District received federal funding

from the Department of Education, and accordingly, the School District and its component

schools were subject to Title IX regulations. See Pls' Ex. Z (Policies) [Doc. No. 63-28]. The

Assistant Superintendent was the appointed coordinator of the implementation and evaluation of

Title IX activities. Id.

The North Andover Public Schools maintain a variety of policies that cover non-

discrimination, non-discrimination on the basis of sex, and sexual harassment. Id.

Under the sexual harassment policies, adopted by the School Committee on September

27, 1994, and revised in 1996, the principal of each school is designated as the Sexual

Harassment Officer, and a person of the opposite sex is designated at the Assistant Sexual

Harassment Officer. Id. at 7. During the relevant time period, Jackson was the Principal of

NAHS. Jackson Dep. Tr. 12:15-13:6 (stating that the 2017-2018 school year was Jackson's first

year as principal) [Doc. No. 63-8]. At the time of Doe and Smith's complaints of sexual assault,

there was no named assistant sexual harassment officer at NAHS. Young Dep. Tr. 98:22-99:10

[Doc. No. 63-13].

The nondiscrimination on the basis of sex policy, revised October 18, 2012, states, in

relevant part, that "[t]he School Committee, in accordance with Title IX of the Education

Amendments of 1972, declares that the school system does not and will not discriminate on the

basis of sex in the educational programs and activities of the public schools." See Pls' Ex. Z, 4

(Policies) [Doc. No. 63-28]. The nondiscrimination policy, as approved by the School

Committee on April 25, 2000, states that:

Any student or school employee who feels that he or she has been discriminated against for any of the reasons cited above should utilize the following procedure to register a grievance:

1. Students or employees should submit any allegations of discrimination in writing to their building principal for consideration.
2. The principal will investigate the allegations and respond to the complainant through personal interview and in writing within ten (10) school days of receipt of the written complaint.
3. If the matter is not resolved, the complainant may appeal in writing to the Title IX Coordinator. The Title IX Coordinator will meet with the complainant and respond in writing within ten (10) school days of receipt of the written complaint.
4. If, at the end of [] ten (10) school days following the written response from the Title IX Coordinator the matter remains unresolved, the complainant has the right to appeal to the Superintendent. All allegations of discrimination are to be communicated to the Superintendent in writing.
5. The Superintendent shall investigate the complaint and respond in writing to the complainant no longer than ten (10) school days after having received the complaint.
6. If the matter remains unresolved the complainant may appeal in writing to the School Committee within ten (10) school days of receipt of the Superintendent's response. The School Committee will meet within fifteen (15) school days to review and consider the matter. The Committee will respond to the complainant in writing within five (5) school days following that meeting.
7. If the matter still remains unresolved for the complainant, he or she has the right to invoke the complaint procedure for Chapter 622 of the Acts of 1971 and/or Title IX of the 1972 Education Amendments.

Since it is important that grievances be processed as rapidly as possible, the number of days indicated at each level should be considered as maximum, and every effort should be made to expedite the process.

Id. at 3. Those policies were included in the 2018-2019 North Andover Public Schools Student Rights and Responsibilities Handbook (the "Student Rights Handbook"),[6] see Pls' Ex. L [Doc. No. 63-14], and referenced in the NAHS Handbook, see Defs' Ex. R [Doc. No. 55-19].

The School District hosted summer retreats for its administrators that included trainings primarily focused on harassment and bullying. Young Dep. Tr. 50:22-51:12 [Doc. No. 63-13]. Young stated that "it wasn't until after this case that the trainings became very Title IX-specific."

---

[6] Plaintiffs report that although the events occurred between 2017 and 2018, the closest publicly available handbook is from the 2018-2019 year. Am. Compl. ¶ 34, n.4 [Doc. No. 30].

Id. at 51:6-8. A "North Andover Public Schools 2016-2017 Annual Back to School Required Staff Training" included a draft PowerPoint with information on sex discrimination and sexual harassment but did not go into Title IX procedures. See Pls' Ex. EE [Doc. No. 63-33]. The annual back to school trainings attended by school staff were prepared by the School District. Jackson Dep. Tr. 28:2-14 [Doc. No. 63-8]. The summer 2017 retreat contained no Title IX discussions, and there was no other training related to Title IX prior to October 2017. Young Dep. Tr. 54:7-19, 63:3-7 [Doc. No. 63-13]. Between 2016 and 2020, Defendants held several trainings related to bullying, discipline, and harassment; however, only one training specifically mentions Title IX in the title. Defs' Ans. to Interrogatories Nos. 10-15 [Doc. No. 55-2].

Gilligan, in his role as Assistant Superintendent, was responsible for training the other Individual Defendants. Gilligan Dep. Tr. 16:4-19 [Doc. No. 63-7]. Prior to October 2017, Gilligan received training on Title IX in August 2016. Id. at 42:2-10. Gilligan testified that directors, assistant superintendents, principals, vice principals, and potentially some others received training on how to conduct a Title IX investigation. Id. at 42:11-23.

Prior to becoming Principal, Jackson received training on Title IX in 2008, and yearly trainings on the laws of harassment and bullying thereafter. Jackson Dep. Tr. 26:13-27:15 [Doc. No. 55-24]. Jackson never facilitated nor prepared a training on Title IX. Id. at 27:16-21.

Prior to fall 2017, Randall had never been to any Title IX-specific training. Randall Dep. Tr. 40:14-23 [Doc. No. 63-11]. Apart from a summer 2016 training with unknown contents, Randall had not participated in other training that included Title IX prior to fall 2017. Id. at 42:10-15.[7]

---

[7] Polanco, to whom Smith initially reported her assault, never received training on Title IX. Polanco Dep. Tr. 24:14-22 [Doc. No. 63-10].

Prior to October 2017, Young had not received any training related to Title IX or specific training on how to investigate complaints of sexual assault. Young Dep. Tr. 54:10-19, 63:3-7 [Doc. No. 63-13].

## II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 322-23.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 255-56. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Id. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at

16

324 (internal quotations omitted). The non-moving party must demonstrate through "submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

### III.   Discussion

#### A.  *Title IX Claims (Counts I and II)*

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681. Title IX's primary purpose is "to prevent recipients of federal financial assistance from using [federal] funds in a discriminatory manner." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 292 (1998). Although Title IX does not expressly provide a private right of action, the Supreme Court has held that Title IX's legislative scheme contains the landmarks of an implied private remedy for offending discrimination. See Cannon v. University of Chicago, 441 U.S. 677, 717 (1979).

Plaintiffs allege in Count II that the Town was deliberately indifferent to Plaintiffs' rapes, and failed to properly investigate the assaults, subjecting Doe and Smith to continued sexual

17

harassment by Tuttle. Am Compl. ¶¶ 319-28 [Doc. No. 30]. They allege in Count I that the Town created a hostile education environment as a result of NAHS customs, policies, and practices that deprived victims, including Doe and Smith, of educational opportunities. Id. at ¶¶ 309-12. Defendants move for summary judgment of the Title IX claims only as to Smith, and not Doe. Defs' Mot. 2 [Doc. No. 54].

      1.  Liability

Title IX allows federal funding recipients[8] to be held liable in damages for "student-on-student sexual harassment" where "they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999); see Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999) ("Broadly speaking, a hostile environment claim requires the victim to have been subjected to harassment severe enough to compromise the victim's employment or educational opportunities and, . . . the institution must have had actual knowledge of the harassment and have exhibited deliberate indifference to it.").

An institution has actual knowledge if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination in the [institution]'s programs[.]" Gebser, 524 U.S. at 290. Further, "[a] plaintiff may show that an institution had 'actual notice' by showing that…it was aware of complaints by other students regarding the same type of sexual harassment as that complained of by the plaintiff." Turley v. McKenzie, 2018 WL 314814, at *11 (D. Mass. Jan. 5,

---

[8] Defendants do not dispute that the School District is a recipient of federal funding and is thus obligated to follow the regulations outlined in Title IX. Answer ¶ 13 [Doc. No. 31].

2018) (internal citations and quotations omitted). Here, prior to Tuttle assaulting Smith, NAHS had previously received two reports of sexual assault against Tuttle, the first by Doe on October 19, 2017, and the second by an unnamed student on February 2, 2018. See Pls' Ex. X (Sankey Report) [Doc. No. 63-26]. Unlike in Turley, where the plaintiff only presented evidence that a former student had complained about hazing without identifying specific incidents, see 2018 WL 314814, at *11, a jury could find that Defendants were on notice that Tuttle had several allegations of sexual assault against him.

A defendant acts with deliberate indifference "to acts of student-on-student harassment only where the [defendants'] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. The bar for a showing of deliberate indifference under Title IX is a high one. Significantly, the Supreme Court has described deliberate indifference as "an official decision by [the person with notice] not to remedy the violation." Gebser, 524 U.S. at 290. A school will not be held liable for deliberate indifference if it takes "timely and reasonable" measures to end harassment. Wills, 184 F. 3d at 26. Rather, a Title IX plaintiff must show that the educational institution either subjected or caused the student to be subjected to the sexual harassment or made the student vulnerable to it, Davis, 526 U.S. at 644–45, either by "refus[ing] to take action to bring the [institution] into [Title IX] compliance," or by making "an official decision ... not to remedy the violation," Gebser, 524 U.S. at 290. While a school may not avoid liability simply by "act[ing] in some way in response to reported sexual harassment," Leader v. Harvard Bd. of Overseers, 2017 WL 1064160, at *4 (D. Mass. Mar. 17, 2017), "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, [or] to craft perfect solutions," Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009). "A

school satisfies its obligations if it engages in a reasonable process for investigating and addressing claims of sexual harassment." Doe v. Emerson College, 271 F.Supp.3d 337, 356 (D. Mass. 2017).

Defendants contend that the School District was not deliberately indifferent because school officials took adequate measures to protect Smith and conduct a Title IX investigation after she reported the assault. Defs' Mem. 13-15 [Doc. No. 56]. They argue that "a claim that a school could have done more in hindsight is not enough." Id. at 13.

Defendants' focus on what they did after Smith reported an assault on April 3, 2018, ignores the prior reports of assaults by Tuttle on other students. "In the educational setting, a school might be found deliberately indifferent 'where it had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective.'" Turley, 2018 WL 314814, at *10 (quoting Porto v. Town of Tewksbury, 488 F.3d 67, 74 (1st Cir. 2007)). Further, the First Circuit had held that an institution may still be liable if it "learns that its measures have proved inadequate" and fails to take further remedial steps. Wills, 184 F.3d at 26. Thus "a response deemed reasonable initially could later become deliberately indifferent if the school system learns that the sexual harassment continued despite the remedial measures." Hunter ex rel. Hunter v. Barnstable Sch. Comm., 456 F.Supp.2d 255, 265 (D. Mass. 2006), aff'd on other grounds sub nom., Fitzgerald, 504 F.3d 165 (1st Cir. 2007), rev'd and remanded on other grounds, 555 U.S. 246 (2009).

Defendants knew that Doe and another female student had alleged that Tuttle had assaulted them just months prior to Smith's assault but took little action. A jury could find that Defendants initially took no measures after the report by Doe, then took inadequate steps to investigate Doe's complaint – even where Tuttle did not deny that he had intercourse with Doe –

and finally prohibited Doe from warning classmates about Tuttle's conduct. Similarly, in <u>Davis</u>,
the Supreme Court found that a petitioner may have been able to show deliberate indifference on
the part of the school board where "the complaint alleges that there were multiple victims who
were sufficiently disturbed by [the accused's] misconduct to seek an audience with the school
principal" but the board "made no effort whatsoever either to investigate or to put an end to the
harassment." 526 U.S. at 653. A reasonable jury could find that by failing to take any action after
Doe and the other student's assault allegations against Tuttle, Defendants had responded with
indifference leading to the assault on Smith.

And even if a jury does not make this inference, it could find that the steps Smith was
mandated to take to avoid Tuttle's continuing interactions – where Smith rather than Tuttle had
to avoid lunch periods and basketball games – demonstrated deliberate indifference. Here, Smith
argues that as a result of Defendants' decision to not investigate Tuttle earlier, she was barred
from a sporting event, <u>see</u> Smith Dep 108:4-22, 109:8-21 [Doc. No. 63-5], had to transfer to
SKA,[9] had to forgo part of her work at the Youth Center after transferring to SKA, <u>id.</u> at 73:5-11,
experienced several incidents of harassment at NAHS,[10] and had to eat in a separate lunchroom
when Tuttle was not removed from her lunch period, <u>id.</u> at 110:17-111:11.

---

[9] The parties dispute why Smith transferred to SKA; Smith states that she transferred to avoid
harassment from Tuttle, <u>see</u> Pls' Opp. 20 [Doc. No. 65], and Defendants state that she transferred
because of poor academic performance, <u>see</u> Randall Dep. Tr. 247:18-24 [Doc. No. 55-21]. For
purposes of summary judgment, the court accepts Smith's statement, as that of the non-moving
party.

[10] Smith testified to an incident where Tuttle and two other girls stared and talked about Smith.
Smith Dep. Tr. 141:15-142:24 [Doc. No. 63-5]. Further, between April 13, 2018, and
approximately June 2018, Randall received between eight and ten reports of contact between
Tuttle and Smith. Randall Dep. Tr. 211:5-15 [Doc. No. 63-11]. These include an incident on
April 24, 2018, where Tuttle and Smith made eye contact while talking into school, <u>id.</u> at 211:16-
212:10, 212:21-213:3, an interaction where Tuttle saw Smith by the gym steps during passing
time, where Randall concluded there was no violation, <u>id.</u> at 217:9-24; an interaction between

Defendants also argue that even if Smith endured harassment, it was not "on the basis of sex" as to support a Title IX claim. Defs' Mem. 14, n.12 [Doc. No. 56]. However, the Court has construed discrimination under Title IX broadly, and "a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes discrimination on the basis of sex." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174-75 (2005) ("'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach."). Whether Smith's alleged harassment meets the level of severe and pervasive is a question of fact for the jury.

As such, Defendants' Motion for Summary Judgment [Doc. No. 54] as to Smith's Title IX claim is DENIED as to Counts I and II.

2.   Emotional Distress Damages under Title IX

While Defendants originally moved for summary judgment as to Smith's Title IX claims for the reasons set forth in the prior section, Defendants' Supplemental Memorandum [Doc. No. 73] argues the Town is also entitled to summary judgment on the ground that Plaintiffs have no cognizable damages where, in accordance with the recent decision in Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, reh'g denied, 142 S. Ct. 2853 (2022), emotional distress

---

Smith and Tuttle on June 8, 2018, in the lunchroom outside the cafeteria, id. at 224:23-225:9; and interaction on June 21, 2018, where Tuttle was talking about court; id. at 232:18-233:16. Randall testified that she received no reports of direct contact between Tuttle and Smith during that time period. Id. at 233:17-25. Smith also sent two emails to Randall regarding incidents on June 1, 2018, where Tuttle allegedly gave Smith a "very intimidating look" at school, and June 11, 2018, where Tuttle was in Smith's classroom. Pls' Exs. S, T [Doc. Nos. 63-21, 61-22]. Although the record does not reflect whether Randall or other NAHS officials investigated each report, at minimum, Randall looked into the June 11, 2018, incident and the gym steps incident. Pls' Ez. T [Doc. No. 63-22]; Defs' Ex. L (June 12, 2018 Police Report) [Doc. No. 55-13].

damages are not available for Title IX violations.[11] In <u>Cummings</u>, the Supreme Court addressed whether a plaintiff may recover damages for emotional distress under the Rehabilitation Act of 1972 and the Patient Protection and Affordable Care Act ("ACA"). The Court held that damages for emotional distress were not available under those two statutes because such damages are not traditionally available in contract law such that federal funding recipients would have clear notice that they may face such a remedy. <u>Id.</u> at 1572, 1576.

Although the Supreme Court's holding applies directly only to the Rehabilitation Act and the ACA, the opinion discussed the four Spending Clause Acts, including Title IX. <u>Id.</u> at 1569. Finding no basis to treat Title IX differently than the Rehabilitation Act and the ACA, the court concludes that <u>Cummings</u> precludes damages for emotional distress under Title IX. Although the First Circuit has not ruled on the issue, most courts interpreting the issue post-Cummings have also found that emotional distress damages are precluded. <u>See, e.g.,</u> <u>Fisk v. Bd. of Trustees of California State Univ.</u>, 2023 WL 2919317, at *12 (S.D. Cal. Apr. 12, 2023) ("Emotional distress damages and punitive damages, however, are not available when a recipient of federal financial assistance discriminates under Title IX because these are not traditional forms of relief for breach contract—i.e., it is not within the Court power to award these types of damages."); <u>Doe 1 v. Curators of Univ. of Missouri</u>, 2022 WL 3366765, at *3 (W.D. Mo. Aug. 15, 2022) ("The Court holds that <u>Cummings</u> applies to Plaintiffs' Title IX claims"); <u>Doe v. City of Pawtucket et al</u>, 2022 WL 4551953, at *3 (D.R.I. Sept. 29, 2022) ("The Supreme Court's opinion in <u>Cummings</u> therefore dictates that emotional distress damages are unavailable in private suits to enforce Title

---

[11] Defendants have not formally moved for summary judgment as to Doe's Title IX claim. But while the court therefore focuses on Smith's claim, the court notes that Plaintiffs do not contend that the legal issue regarding the availability of emotional distress damages under Title IX will be any different for Doe.

IX.); Bonnewitz v. Baylor Univ., 2022 WL 2688399, at *3 (W.D. Tex. July 12, 2022) (report and recommendation holding that Cummings "prohibits emotional distress damages for Title IX retaliation claims"). One court has allowed damages evidence because "Cummings was not a Title IX action," see Doe v. Purdue Univ., 2022 WL 2828238, at *4 (N.D. Ind. July 20, 2022), but the decision is not persuasive where the court provided no reasoning to support the conclusion, see City of Pawtucket, 2022 WL 4551953, at *3 (noting that Purdue University provides little persuasive value).

However, Cummings does not bar Smith's Title IX claims wholesale where she seeks remedies beyond emotional distress damages. Although Defendants correctly note that any request for injunctive relief is moot because Smith is no longer enrolled at NAHS, Smith seeks other relief, including damages for tuition, school expenses, and expenses incurred as a consequence of the assaults. See Am. Compl. 61 [Doc. No. 30]. Accordingly, while Smith's claims for emotional distress damages under Title IX are barred, Defendants' Motion for Summary Judgment [Doc. No. 54] on Smith's Title IX claims on the basis that she suffered no cognizable damages is DENIED.

B.    *Section 1983 Claims (Count III and IV)*

Doe and Smith bring claims against the Individual Defendants in their individual capacities for violations of procedural and due process under 42 U.S.C. § 1983.[12] Defendants move for summary judgment on both claims under a theory of qualified immunity.

───────────────

[12] Plaintiffs originally brought their § 1983 claims also against the Town and the Individual Defendants in their official capacities. See Am. Compl. [Doc. No. 30]. However, at the November 9, 2022 motion hearing, Plaintiffs moved to dismiss their § 1983 claims against the Town. See Hearing Tr. 27:22-28:21 [Doc. No. 80].

The court understands Plaintiffs to not be pursuing the §1983 claims against the Individual Defendants in their official capacities. In any event, no such claims lie here. "[N]either a state

Section 1983 creates a civil cause of action against an individual acting under color of state law who violates a plaintiff's federally protected rights. 42 U.S.C. § 1983. "A claim under section 1983 has two essential elements. First, the challenged conduct must be attributable to a person acting under color of state law." Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). "[S]econd, the conduct must have worked a denial of rights secured by the Constitution or by federal law." Id.

To succeed on procedural due process claims, a plaintiff must demonstrate (1) that she has been deprived of a protected interest and (2) that the deprivation was accomplished without due process of law. Perez–Acevedo v. Rivero–Cubano, 520 F.3d 26, 30 (1st Cir. 2008). Here, Smith alleges that Individual Defendants failed to conduct a thorough and fair investigation, forced her to sign two safety plans, and intentionally did not afford her with basic due process rights required by public schools. Am. Compl. ¶¶ 335-36 [Doc. No. 30]. Similarly, Doe alleges that the Individual Defendants failed to investigate her sexual assault claim and did not provide her notice as to Tuttle's bullying complaint against her. Id.; Pls' Opp. 21 [Doc. No. 65].

"In order to assert a valid substantive due process claim, [Plaintiffs] have to prove that they suffered the deprivation of an established life, liberty, or property interest, *and* that such deprivation occurred through governmental action that shocks the conscience." Clark v.

---

agency nor a state official acting within his official capacity may be sued for damages in a section 1983 action." Johnson v. Rodriguez, 943 F.2d 104, 108 (1st Cir. 1991) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989)). Although state officials may be sued in their official capacities for prospective injunctive relief, see Papasan v. Allain, 478 U.S. 265, 277–78 (1986); Whalen v. Mass. Trial Court, 397 F.3d 19, 29-30 (1st Cir. 2005), Plaintiffs' claims for injunctive relief are moot where neither Smith nor Doe currently attend NAHS, see Hearing Tr. 30:11-20 (conceding that "there is no standing for injunctive relief"). Declaratory judgment actions may also be brought against state officials in their official capacities, see Alden v. Maine, 527 U.S. 706, 757 (1999), but the Amended Complaint [Doc. No. 30] does not seek declaratory judgment.

Boscher, 514 F.3d 107, 112 (1st Cir. 2008) (italics in original). "Deliberately indifferent behavior may suffice where the state actor had an opportunity to reflect and make reasoned and rational decisions, but the plaintiff 'must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm ... and disregarded that risk." Doe v. Dennis-Yarmouth Reg'l Sch. Dist., 578 F. Supp.3d 164, 176 (D. Mass. 2022) (internal quotations and citations omitted). Both Plaintiffs' substantive due process claims are very similar to their Title IX claims, and they allege that Defendants' deliberate indifference to the assaults subjected Plaintiffs to a hostile education environment on the basis of their gender. Am. Compl. ¶¶ 345-353 [Doc. No. 30]. Defendants argue that even if NAHS officials knew that Tuttle posed a substantial risk of harm to female students, they took action by removing Tuttle from Smith's classes, implementing safety plans, moving Tuttle's wrestling practice, and investigating further complaints. Defs' Mem. 18 [Doc. No. 56]. Additionally, Defendants argue that it would be unreasonable to conduct disciplinary proceedings for every incident of peer-to-peer contact, and that their behavior does not rise to a level of "conscience shocking." Id. at 19. Plaintiffs only respond that Defendants acted with deliberate indifference, as outlined in their Title IX claims. Pls' Opp. 21 [Doc. No. 65].

The court need not resolve this dispute. Even if the Individual Defendants did violate Doe and Smith's constitutional rights to due process, the Individual Defendants are entitled to summary judgment on the § 1983 claims against them in their individual capacities under the doctrine of qualified immunity.

"Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" Marrero-

Mendez v. Calixto-Rodriguez, 830 F.3d 38, 43 (1st Cir. 2016) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 735 (2011)). "If either of the two prongs is not met—i.e., if the facts do not show a constitutional violation or the right in question was not clearly established—the officer is immune. Either prong may be addressed first, depending on 'the circumstances in the particular case at hand.'" Id. (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)). "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the defendant's position would have known that his [or her] conduct violated that rule of law." Id.

As another judge in this District recently explained, "[b]ecause the court has been unable to find a consensus of authority establishing that affirmative acts by school officials that lead to or enhance the danger of peer-on-peer sexual assault violate students' due process right to bodily integrity, the Court must find that [the school principal] is entitled to qualified immunity…." Doe1 v. Bos. Pub. Sch., 2019 WL 1005498, at *7 (D. Mass. Mar. 1, 2019). While "the right to bodily integrity is clearly established," id., Plaintiffs have not sufficiently shown that the alleged due process violations by the Individual Defendants were established by precedent "beyond debate," Mullenix v. Luna, 577 U.S. 7, 12  (2015); see Rivera-Corraliza v. Morales, 794 F.3d 208, 215 (1st Cir. 2015) ("[W]hen a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense.").

As such, Defendants' Motion for Summary Judgment [Doc. No. 54] is GRANTED as to Counts III and IV.

C.     *Breach of Contract (Count V) and Denial of Basic Fairness (Count VI)*

Doe and Smith bring a claim for breach of contract against the Town based on the distribution of the NAHS Handbook, Defs' Ex. R [Doc. No. 55-19], which references the Student Rights Handbook, Pls' Ex. L [Doc. No. 63-14] (collectively, "the Handbooks"), which contains the nondiscrimination and harassment policies, see Pls' Ex. Z [Doc. No. 63-28]. They allege that the Handbooks created an enforceable contractual relationship between Defendants and Plaintiffs, see Am. Compl. ¶ 358 [Doc. No. 30], and that the Defendants breached the contract in their handling of the Title IX investigations and the failure to provide students with a safe environment free from harassment and retaliation. Id. at ¶ 356-89. Defendants argue that the Handbooks are not contractually enforceable because they only contain vague terms which do not create a "reasonable expectation" of the term meanings. Defs' Mem. 29 [Doc. No 56]. Plaintiffs counter that Massachusetts law has often interpreted student handbooks as binding agreements. Pls' Opp. 24 [Doc. No. 65].

The NAHS Handbook states, inter alia, that no person should be discriminated against on the basis of sex or gender identity in admission or in access to courses of study, Defs' Ex. R 43[13] [Doc. No. 55-19], and specifically under Title IX that the school system will not discriminate on the basis of sex in educational or employment opportunities, id. at 44. With respect to harassment, the NAHS Handbook states that students have the right to be free from harassment and retaliation, and any such allegations "will be promptly and reasonably investigated." Id. The NAHS Handbook contains a link to the full School District policy on harassment on the "NA Student Handbook Right and Responsibilities high school web page at [web address], which

---

[13] Exhibit R page numbers correspond to the actual handbook pages on the bottom right corner.

includes "procedures for filing complaints related to harassment." Id. The 2017-2018
Discrimination and Harassment Policies, Pls' Ex. Z [Doc. No. 63-28], and the Students Rights
Handbook, Pls' Ex. L [Doc. No. 63-14] contain the investigative steps and procedures regarding
harassment and discrimination.

Enforcement of a contractual relationship requires a plaintiff to demonstrate "that the
parties reached a valid and binding agreement" such that a contract is created. Coll v. PB
Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995). Further, a valid contract under
Massachusetts law requires consideration to be enforceable. Neuhoff v. Marvin Lumber & Cedar
Co., 370 F.3d 197, 201 (1st Cir. 2004). While student handbooks have been repeatedly found to
be enforceable contracts in the university and private school contexts, see, e.g., G. v. Fay Sch.,
931 F.3d 1, 12 (1st Cir. 2019) (holding that "an agreement may be memorialized in a student
handbook" at a private school); Driscoll v. Bd. of Trustees of Milton Acad., 70 Mass. App. Ct.
285, 293, 873 N.E.2d 1177, 1186 (2007) (holding that a private school policy that prohibited
students from attending parties with alcohol or drugs could create a "reasonable expectation" for
students), Plaintiffs have provided no authority in the public school context.

Whereas the consideration for a private school or public university may be the tuition in
exchange for education, Massachusetts "has a duty to provide an education for all its children,
rich and poor, in every city and town of the Commonwealth at the public school level[.]"
McDuffy v. Sec'y of Exec. Off. of Educ., 415 Mass. 545, 606, 615 N.E.2d 516, 548 (1993);
Mass. Gen. Laws Ann. ch. 71, § 1 (West) ("Every town shall maintain… a sufficient number of
schools for the instruction of all children who may legally attend a public school therein.").
Because the Town has a statutory duty to provide a public education, a handbook between a
school and its students lacks the consideration necessary for an enforceable contract.

Plaintiffs' denial of basic fairness claim fares no better. "[A]lthough denial of basic fairness is a recognized theory of recovery, the precise contours of such a claim are yet to be clearly defined." Sonoiki v. Harvard Univ., 37 F.4th 691, 714 (1st Cir. 2022). The theory, however, is closely related to breach of contract ideas, id., much akin to a breach of good faith and fair dealing. Where Plaintiffs' theory of denial of basic fairness tracks the contract argument and where there is no enforceable contract, a claim for denial of basic fairness also fails.

As such, Defendants' Motion for Summary Judgment [Doc. No. 54] is GRANTED as to Count V and Count VI.

D.     *Intentional Infliction of Emotional Distress (Count VII)*

Doe and Smith claim intentional infliction of emotional distress, arguing that Defendants know or should have known that their actions, including requiring Plaintiffs to attend NAHS with Tuttle, requiring Smith to follow a restrictive safety plan, and the method of investigation, would result in Doe and Smith's emotional distress. Am. Compl. ¶¶ 398-406 [Doc. No. 30]. Defendants move for summary judgment as to both Doe and Smith.

"In order to prevail on a claim of intentional infliction of emotional distress, a plaintiff must show that: '(1) the defendant intended to inflict emotional distress, or knew or should have known that emotional distress would likely result, (2) the defendant's conduct was extreme and outrageous to the extent that it was utterly intolerable in a civilized society, (3) the defendant's conduct caused the plaintiff's distress, and (4) the plaintiff sustained severe emotional distress.'" Mercurio v. Town of Sherborn, 287 F.Supp.3d 109, 125 (D. Mass. 2017) (quoting Johnson v. Town of Nantucket, 550 F.Supp.2d 179, 183 (D. Mass. 2008)).

Plaintiffs do not dispute that the Town and the Individual Defendants in their official capacities are immune from liability for intentional torts under the Massachusetts Tort Claims

Act, M.G.L. ch. 258 §§ 1, 10(c) ("MCTA"). See Kelley v. LaForce, 288 F.3d 1, 12-13 (1st Cir. 2002) ("a municipality enjoys governmental immunity for intentional torts under the Massachusetts Tort Claims Act."); see Brown v. Dep't of Correction, 2021 WL 3550836, at *3 (D. Mass. Aug. 11, 2021) ("an MTCA claim for an intentional tort, including assault and battery or intentional mental distress, are exceptions to the MTCA and…official capacity claims against its officers are subject to sovereign immunity under Massachusetts state law.").

The MTCA does not bar intentional tort claims against officials in their individual capacity. See Pace v. Dep't of Corr., 2021 WL 1132145, at *5 (D. Mass. Mar. 24, 2021) (quoting Parker v. Chief Just. For Admin. & Mgmt. of Trial Ct., 67 Mass. App. Ct. 174, 180, 852 N.E.2d 1097, 1103 (2006) ("With respect to intentional torts, including intentional infliction of mental distress, claims … may be asserted against the public employee in his individual capacity."). The Individual Defendants argue that the original cause of harm was the assaults by Tuttle, not the actions taken by school administrators, and that deliberate indifference is not sufficient to maintain an IIED claim. Defs' Mem. 22 [Doc. No. 56]. Further, the Individual Defendants argue that they are immune under the doctrine of common-law immunity. See Breault v. Chairman of Bd. of Fire Comm'rs of Springfield, 401 Mass. 26, 33 n.7 (1987) (holding that common-law immunity does not apply to ministerial, versus discretionary, acts).

The court finds that the evidence submitted is insufficient for a jury to find that the Individual Defendants' actions rise to the level of severe and outrageous conduct required for an intentional tort claim. Conduct only meets the bar for extreme and outrageous if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (internal quotations and citations omitted).

Additionally, "Massachusetts courts have found that the 'passive conduct' of 'fail[ing] to act in preventing or remedying the bullying' of a student by other students is insufficient to state a claim for IIED." Roe v. Lincoln-Sudbury Reg'l Sch. Dist., 2021 WL 1132256, at *44 (D. Mass. Mar. 24, 2021) (internal citations omitted). Reading the facts in the record in the light most favorable to Plaintiffs, they "do not appear to constitute the sort of targeted, deliberate, and malicious conduct that is required for an IIED claim." Doe v. Brandeis Univ., 177 F.Supp.3d 561, 617 (D. Mass. 2016); see Doe v. Emerson Coll., 153 F.Supp.3d 506, 518 (D. Mass. 2015) (holding that a plaintiff's "allegations [that] largely rest on [her] dissatisfaction with Emerson's policies and procedures, what she perceived to be their inadequate sensitivity to her issues, and the results of the various investigations" could not form the basis of an IIED claim).

As such, Defendants' Motion for Summary Judgment [Doc. No. 54] is GRANTED as to Count VII.

E.   *Negligence (Count VIII) and Negligent Infliction of Emotional Distress (Count IX)*

Doe and Smith allege that Defendants breached their duty to provide an education free from harassment and retaliation. Further, they allege that Defendants breached their duty to sufficiently train and supervise individuals charged with investigating Title IX complaints. Am. Compl. ¶¶ 409-21 [Doc. No. 30]. Defendants move for summary judgment against both Smith and Doe based on immunity grounds.

The court first addresses (1) the liability of the Individual Defendants in their individual capacities under the MTCA, (2) the liability of the Individual Defendants in their official capacities and the Town Defendants under the discretionary function exception, and finally (3) the liability of the Town Defendants under § 10(j) of the MTCA.

1.   Individual Defendants in Their Individual Capacities

Under the MTCA, a public employee acting in the scope of their employment whose negligent or wrongful act or omission makes the public employer liable is not personally liable for any personal injury, death, or property damages caused. M.G.L. c. 258 § 2; see Petricca v. City of Gardner, 194 F.Supp.2d 1, 4 (D. Mass. 2002) (listing cases where MTCA immunizes public employees from personal liability for negligence); Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003) (holding that "the Tort Claims Act shields public employees from personal liability for negligent conduct"). Where Plaintiffs do not allege that the Individual Defendants were acting outside of the scope of employment, the Individual Defendants are entitled to immunity for the negligence claims against them in their individual capacities.

2.   Discretionary Function Exception

Plaintiffs bring negligence claims against both the Town and the Individual Defendants in their official capacities. Under the MTCA, a public employer can be liable for a wrongful act or omission of any public employee acting within their scope of employment. M.G.L. c. 258 § 2. However, Massachusetts common law and the MTCA provide related exceptions to liability based on discretionary acts. "At common law, [] a public official exercising judgment and discretion was not liable for negligence or other error in the making of an official decision if he acted in good faith, without malice, and without corruption." 14D Mass. Prac., Summary of Basic Law § 16:103 (5th ed.); Breault, 401 Mass. at 37; Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 146 (1st Cir. 2016) (holding same). Further, under the MTCA, municipalities are immune from "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public

employer…acting within the scope of his office or employment, whether or not the discretion involved is abused." M.G.L. ch. 258, § 10(b).

"The discretionary function exception is narrow, providing immunity only for discretionary conduct that involves policy making or planning. Deciding whether particular discretionary acts involve policy making or planning depends on the specific facts of each case." Greenwood v. Town of Easton, 444 Mass. 467, 470, 828 N.E.2d 945, 948 (2005) (internal quotations and citations omitted). "This exclusion is designed to immunize policymaking or planning, as opposed to operational actions." Dennis-Yarmouth Reg'l Sch. Dist., 578 F.Supp.3d at 174–75.

The discretionary function exception is a two-pronged inquiry. First, the court must "determine whether the governmental actor had any discretion. . . to do or not to do what the plaintiff claims caused [the] harm." Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141, 587 N.E.2d 780 (1992). Second, the court must "determine whether the discretion that the actor had is that kind of discretion for which § 10(b) provides immunity from liability." Id. That is, as a general matter, if the discretionary act rests on planning and policymaking, there is immunity; however, if the act involves the implementation and execution of governmental policy or planning, there is no immunity. Greenwood, 44 Mass. at 470. "Only those decisions which involve social, political, or economic policy considerations are immunized from tort liability by § 10(b)." Doe v. Bradshaw, 203 F.Supp.3d 168, 187 (D. Mass. 2016) (internal quotations omitted).

Plaintiffs' negligence claims are based on Defendants' failure to provide a school environment free from harassment by (1) Defendants' insufficient actions in applying the Title IX investigation procedures as outlined in the handbooks, and (2) a failure to properly train

school employees on Title IX and sexual assault procedures. Am. Compl. ¶¶ 409-21 [Doc. No. 30].

First, under the nondiscrimination policy [Doc. No. 63-28], approved by the School Committee on April 25, 2000, the Assistant Superintendent is the coordinator of the implementation and evaluation of all Title IX activities. Under the policy, upon a written complaint of discrimination, "the principal will investigate the allegations and respond to the complainant through personal interview and in writing within ten (10) school days of receipt of the written complaint." Pls' Ex. Z, 3 (Policies) [Doc. No. 63-28]. The policy also explains the process and timing for any appeals. Id. Under the Sexual Harassment Administrative Guidelines and Procedures, adopted by the School Committee on September 27, 1994, and revised in 1996, the Principal, as Sexual Harassment Officer, "shall immediately investigate" a formal complaint of sexual harassment and provide a written report to either the School District Sexual Harassment officer or the Superintendent within 10 days. Id. at 7, 9. Additionally, "the Sexual Harassment Officer may take immediate steps, at his/her discretion, to protect the complainant, students, and employees pending completion of an investigation of alleged sexual harassment." Id. at 9. Upon an investigation, the School District "will take such actions as appropriate based on the results of the investigation." Id. at 10. Finally, upon observing, overhearing, or witnessing sexual harassment, all employees of the North Andover public schools must take "immediate and appropriate action to stop such harassment and to prevent is recurrence." Id. at 7.

Defendants argue that the Individual Defendants were engaging in a discretionary function while "interpreting and carrying out the High School's Harassment Policy as they deemed appropriate under the circumstances." Defs' Mem. 24 [Doc. No. 56]. Defendants' argument is not persuasive. Doe's complaint of sexual assault was not investigated by Jackson as

designated Sexual Harassment Officer or anyone else until nearly four months after her assault. Under the policies, the Sexual Harassment Officer is required to conduct an investigation within 10 days, and a failure to do so cannot be categorized as a discretionary policy-making decision.

As to Smith, while Randall and Young did conduct an investigation into her complaint within the required time period, Smith's claim goes beyond their reactions to her complaint. By failing to conduct Doe's investigation in a timely manner, Defendants put other students, including Smith and the unnamed student discussed in the Sankey Report [Doc. No. 63-26], at risk. Where the court finds that the failure to investigate Doe's complaint in a timely manner was not a discretionary function, and that alleged negligence by Defendants potentially caused Smith's alleged harm, the court finds that the discretionary function exception is not applicable as to the Defendants' implementation of the sexual harassment policies.

Second, Defendants claim that the Town Defendant's decision on how to train, or the failure to train, employees on Title IX investigatory procedures, was a discretionary function subject to immunity. Plaintiffs argue that the lack of training and supervision caused them harm, including in the issuance of the restrictive safety plan to Smith. Under the Sexual Harassment Administrative Guidelines and Procedures [Doc. No. 63-28], all School District employees were to receive an individual copy of the policies and guidelines annually, and the School District was to provide training to staff on sexual harassment. Further, the policy states that the sexual harassment officers and assistant officers were to receive specialized training and resources. Pls' Ex. Z, 10 (Policies) [Doc. No. 63-28].

While the question on how to provide training may fall within the discretionary function exception, that is not the question before the court where Plaintiffs charge that Defendants failed

to comply with its own training policies. Accordingly, the court cannot find that the narrowly-applied discretionary function bars Plaintiffs' claims in this case.

### 3.   Immunity For Failure to Act

Alternatively, Defendants argue that section 10(j) of the MTCA immunizes them against a negligence claim based on their alleged failure to protect Doe and Smith from Tuttle. Section 10(j) states that the MTCA does not apply to "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." M.G.L. c. 258 § 10(j). "The Massachusetts Supreme Judicial Court ('SJC') has 'construed the original cause language to mean an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party." Correia v. Town of Westport, 2017 WL 3940931, at *8 (D. Mass. Sept. 7, 2017) (quoting Kent v. Com., 437 Mass. 312, 318, 771 N.E.2d 770 (Mass. 2002)). "The SJC also clarified that this affirmative act 'must have materially contributed to creating the specific condition or situation that resulted in the harm.' The mere failure to act cannot give rise to liability for negligence under the MTCA." Id.

For § 10(j) to not apply, "the claim must involve '*something more* than the pure failure to alleviate a private harm' and that to be successful a claimant must show '*some* involvement of a public employee in creating the injury-causing scenario, not simply a failure to respond adequately after it arises.'" Armstrong v. Lamy, 938 F.Supp. 1018, 1043 (D. Mass. 1996) (quoting Joseph W. Glannon, Liability for "Public Duties" Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 MASS. L. REV. 17, 26 (1994)) (emphasis in original). Courts further require plaintiffs to establish that the negligent act "materially

contributed to creating the specific 'condition or situation' that resulted in the harm." <u>Kent</u>, 437 Mass. at 319.

Here, Defendants argue that the harm was caused by Tuttle, and Defendants cannot be liable for a failure to prevent or mitigate the harm done by him, either through the Title IX investigation or in the training of school employees. Courts have repeatedly held that "allegations related to … claims of negligent supervision, training and investigation are barred by the MTCA." <u>Bradshaw</u>, 203 F.Supp.3d at 186; <u>see</u> <u>Doe v. Fournier</u>, 851 F.Supp.2d 207, 224–25 (D. Mass. 2012), on reconsideration in part (Mar. 20, 2012) ("Courts have repeatedly held that a claim for negligent supervision alone is barred by section 10(j)."); <u>see also</u> <u>Pettengill v. Curtis</u>, 584 F.Supp.2d 348, 366 (D. Mass. 2008) (holding that negligent supervision is an omission rather than an affirmative act). Thus, a claim that municipal employees failed to train or supervise are considered a "failure to alleviate or respond to a private harm" that is subject to dismissal. <u>See</u> <u>Armstrong</u>, 938 F.Supp. at 1043-46.

While claims for negligent hiring as an affirmative act have been upheld, Plaintiffs' only claims relate to the training and supervision of school employees, along with the negligent implementation of policies. Plaintiffs argue that the Town should have had a more stringent policy towards sexual assault; however, the original cause of the harm was still Tuttle, not the Defendants. Thus, the alleged failure to implement better policies or investigate sooner falls under the immunity for failure to act exception to the MTCA.

As such, Defendants' <u>Motion for Summary Judgment</u> [Doc. No. 54] is GRANTED as to Counts VIII and IX.

**IV.      Conclusion**

For the foregoing reasons, Defendants' <u>Motion for Summary Judgment</u> [Doc. No. 54] on

Smith's claims in Counts I and II is DENIED (except as to her claim for emotional distress

damages) and on both Plaintiffs' claims in Counts III through VIII is GRANTED.

IT IS SO ORDERED

May 16, 2023                                                              /s/ Indira Talwani
                                                                              United States District Judge